**ORAL ARGUMENT NOT YET SCHEDULED**

**Case No. 13-5090**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**
_____

**CATHOLIC HEALTHCARE WEST**

**Appellant,**

**v.**

**KATHLEEN SEBELIUS**

**Appellee,**
_____

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**
_____

**BRIEF FOR APPELLANTS**
_____

**JEFFREY A. LOVITKY**

Attorney at Law
1776 K. Street, N.W.,
Ste. 800
Washington, D.C. 20006
T: (202) 429-3393
F: (202) 318-4013
Email: Lovitky@aol.com

## CIRCUIT RULE 28 CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES

### A.  Parties and Amici

The parties are Appellant, Catholic Healthcare West, and Appellee Kathleen Sebelius, in her official capacity as Secretary of Health and Human Services.  The parties who appeared before the District Court were Plaintiff Catholic Healthcare West, and Defendant, Kathleen Sebelius, in her official capacity as Secretary of Health and Human Services.

There are no intervenors or amici in either this Court or the District Court.

**Circuit Rule 26.1 Disclosures**.

Appellant, plaintiff below, is a hospital system that participates in the Medicare program. Appellant is a non-profit corporation exempt from federal and state income taxes.  There is no parent or publicly held company who has a 10% or greater ownership interest in Appellant. Appellant has issued tax free bonds to the public.

### B. Rulings under Review

Appellant seeks review of the Memorandum Decision and Order entered in *Catholic Healthcare West v. Sebelius*, 2013 U.S. Dist. LEXIS 11320, Civil Action No. 11-459 (GK) by the Honorable Gladys Kessler on January 29, 2013. No official citation exists for this Memorandum Opinion and Order.

## C. **Related Cases**

This case has not previously been before this or any other court, except for the District Court as noted above. Counsel for Appellant is not aware of any other related cases "involving substantially the same parties and the same or similar issues," as defined in Circuit Rule 28(a)(l)(C).

Dated: July 29, 2013

Respectfully Submitted

/s/ Jeffrey A. Lovitky
_____
JEFFREY A. LOVITKY
Attorney at Law
1776 K Street, N.W., Ste. 200
Washington, DC 20006
Telephone: (202) 429-3393
Facsimile: (202) 318-4013
Lovitky@aol.com

# TABLE OF CONTENTS

CIRCUIT RULE 28 CERTIFICATE AS TO PARTIES, RULINGS
AND RELATED CASES ....................................................................... ii

A.  Parties and Amici ........................................................................ ii

1. Circuit Rule 26.1 Disclosures ...................................................... ii

B. Rulings under Review ................................................................. . ii

C. Related Cases .............................................................................. iii

TABLE OF AUTHORITIES ............................................................... vi

GLOSSARY ......................................................................................... xi

JURISDICTIONAL STATEMENT ....................................................... 1

PERTINENT STATUTES AND REGULATIONS ................................ 1

STATEMENT OF THE ISSUES PRESENTED .................................... 1

STATEMENT OF FACTS ...................................................................... 2

    A. Statutory and Regulatory Framework…………………………………..2

    B. The Merger Agreement…………………………………………………5

    C.  The Present Litigation………………………………………...……………11

SUMMARY OF ARGUMENT ............................................................. 13

ARGUMENT ........................................................................................ 15

    A. Standard of Review ...................................................................... 15

    B. The Secretary's Exclusive Reliance Upon The Cost Methodology In
    Determining Whether Reasonable Consideration Was Paid Was Inconsistent
    With Agency Regulations...……………….…………………………….. 16

C. The Fact That Marian Was Motivated By Non-Monetary Considerations In Its Selection Of A Merger Partner Did Not Require Disallowance Of The Depreciation Loss Adjustment……………………………………………….. 23

D. The Agency Failed To Publish Notice Of PM-00-76 In The Federal Register As Required By 42 U.S.C. § 1395hh(c)(1)…………………………………... 29

E. The Parties to the Merger Were Not Related Entities………………..… 36

   1. The Secretary Improperly Applied a "Continuity of Control" Analysis in Determining That the Parties to the Merger Were Related………………… 36

   2. There Was No Evidence of Continuity of Control between Marian and CHW-CC, Even Assuming Such an Analysis Could be Applied………….. 40

CONCLUSION ......................................................................................52

CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a)(7)(C) AND D.C. CIRCUIT RULE 32(a) ........................................................54

ADDENDUM – PERTINENT STATUTES AND REGULATIONS.

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Federal Cases

*Biloxi Regional Medical Center v. Bowen*, 835 F.2d 345 (D.C. Cir. 1987)…………………………………………………………… 15, 16

*Board of Regents of the Univ. of Wash. V. EPA*, 86 F.3d 1214 (D.C. Cir. 1996)………………………………………………………….….. 52

*Bowman Transp., Inc. v. Arkansas-Best Freight System, Inc.,* 419 U.S. 281 (1974)………………………………………………………….... 23

*Califano v. Sanders*, 430 U.S. 99, (1977)…………………………...……… 15

*Camp v. Pitts*, 411 U.S. 138, 142-143, 36 L. Ed. 2d 106, 93 S. Ct. 1241 (1973)………………………………………….………………… 41

*Chamber of Commerce of the United States v. SEC*, 412 F.3d 133 (D.C. Cir. 2005)………………...………………………………...…………….…… 16

*Chippewa Dialysis Servs. v. Leavitt*, 511 F.3d 172 (D.C. Cir. 2007)………..…. 33

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 28 L. Ed. 2d 136, 91 S. Ct. 814 (1971)……………...…………………….14, 15, 23, 29

*Doe v. Exxon Mobil Corp.*, 2011 U.S. App. LEXIS 13934 (D.C. Cir. 2011)...………………………………………………………….... 34

*Doraiswamy v. Secretary of Labor*, 555 F.2d 832 (D.C. Cir. 1976)…………....... 41

*Environmental Defense Fund, Inc. v. Costle*, 657 F.2d 275 (D.C. Cir. 1973)……………………………………………………….……….. 41

*Forsyth Mem. Hosp., Inc. v. Sebelius*, 639 F.3d 534 (D.C. Cir. 2011)…......…· 3, 20

*Int'l Union, United Mine Workers v. Dep't of Labor*, 358 F.3d 40 (D.C. Cir. 2004)………………………………………………………..……… 16

*Jeanes Hosp. v. Leavitt*, 453 F. Supp. 2d 888, 901-02 (E.D. Pa.

2006)……………………………………………………………………... 45

*Jeanes Hosp. v. Sec'y of HHS*, 448 Fed. Appx. 202. 2011 U.S. App. LEXIS 20951 (3rd Cir. 2011)…………………….....………………….... 26, 33

*Lake Med. Ctr. v. Thompson*, 243 F.3d 568 (D.C. Cir. 2001).……………….…… 3

*Laningham v. United States Navy*, 813 F.2d 1236 (D.C. Cir. 1987)…..………… 50

*Marseilles Land & Water Co. v. FERC*, 345 F.3d 916 (D.C. Cir. 2003).………... 30

*Pacific Home v. County of Los Angeles*, 41 Cal. 2d. 844, 264 P. 2d 539 (1953)... 24

*Paralyzed Veterans of Am. v. D.C. Arena L.P.,* 117 F.3d 579 (D.C. Cir. 1997)…………………….……………………………………………… 19, 30

*People v. Orange County Charitable Services*, 73 Cal. App. 4th 1054, 87 Cal. Rptr. 2d 253 (1999)……………...…………………………………… 25

*Pinnacle Health Hosps. v. Sebelius*, 681 F.3d 424 (D.C. Cir. 2012)…........…….. 33

*Queen of Angels Hospital v. Younger*, 66 Cal. App. 3d 359; 136 Cal. Rptr. 36 (Cal. App. 2d Dist. 1977)……………………………………… 26

*Secretary of Labor, Mine Safety & Health Admin. v. Western Fuels-Utah, Inc.,* 900 F.2d 318 (D.C. Cir. 1990)……………………………………………….. 33

*St. Lukes Hosp. v. Sebelius*, 611 F.3d 900 (D.C. Cir. 2010)……...……….. 3, 33, 34

*Syncor International Corp. v. Shalala*, 127 F.3d 90 (D.C. Cir. 1997)...……….. 33, 34

*Tenet Healthsystems Healthcorp v. Thompson*, 254 F.3d 238 (D.C. Cir. 2001)………...…………………………………………………...………… 15

Trailways, Inc. v. Interstate Commerce Com., 673 F2d 514 (D.C. Cir. 1982)……………………………………………………..………... 23

*UPMC-Braddock Hosp. v. Sebelius*, 592 F.3d 427 (3rd Cir. 2010)………………………………………….……... 27, 36, 38, 40, 45

*United States v. Cartwright*, 411 U.S. 546 (1973)……………………...………… 19

*Van Nuys v. United States*, 75-2 U.S. Tax Cas. (CCH) P13,081;
1975 U.S. Dist. LEXIS 13036, 24*…………………………….……………..... 25

*\*Via Christi Reg'l Med. Ctr., Inc. v. Leavitt*, 509 F.3d 1259 (10th Cir.
2007)………………………………………………………………... 37, 40

*Williams Gas Processing-Gulf Coast Co*., L.P. v. FERC, 475 F.3d
319 (D.C. Cir. 2006)………………………………...………………..…… 16

**Statutes**

5 U.S.C. § 551(5)………………………………………………………...… 30

5 U.S.C. § 552(a)(1)(D)……………………………………………………… 32

5 U.S.C. § 553……………………………………………………………... 31

5 U.S.C. § 557(c)(3)(A)……………………………………………… 22, 29

5 U.S.C. § 701 et seq……………………………………………………… 15

5 U.S.C. § 706(2)(A)(E)……………………………………………………… 15

28 U.S.C. § 1291…………………………………………………….....… 1

42 U.S.C. § 1395 et seq………………………………………………….... 2

42 U.S.C. § 1395f(b)(1)………………………………………….................... 2

42 U.S.C. § 1395hh…………………………………………………….... 34

42 U.S.C. § 1395hh(a)(2)…………………………………………….…... 31, 32

*\*42 U.S.C. § 1395hh(c)(1)………..……………………………… 29, 31, 32, 34, 35

*\*42 U.S.C. § 1395hh(e)………………………………………………..… 34

42 U.S.C. § 1395hh(e)(1)..…………………………………………….... 32, 34

42 U.S.C. 1395hh(e)(1)(A)………………………………….….... 35

42 U.S.C. § 1395hh(e)(1)(C)……………………………………. 35

42 U.S.C. § 1395oo(f)……………………………………... 1, 12, 13

42 U.S.C. § 1395oo(f)(1)………………………………………. 15

42 U.S.C. § 1395x(v)(1)(O)……………………………….…... 2, 3

Cal. Corp. Code § 5142…………………………………… 25, 42

Cal. Corp. Code § 5250………………………………………... 25

Cal. Corp. Code § 5914………………………………………... 25

Cal. Corp. Code § 5917(e)…………………………………….. 26

Cal. Corp. Code § 9111………………………………………... 27

Cal. Gov. Code § 12598………………………………….…... 25

### Federal Regulations

26 C.F.R. § 1.148-5(d)(6)…………………………………….... 19

26 C.F.R. § 1.170-1(c)………………………………………... 19

42 C.F.R. § 405.1875(f)(2)……………………………………. 40

*42 C.F.R. § 413.17……………………….……………… 33, 36, 37, 45

42 C.F.R. § 413.17(b)…………………………………………. 38

42 C.F.R. § 413.17(b)(1)…………………………………….... 38

42 C.F.R. § 413.17(b)(3)…...………………………………..... 39

42 C.F.R. § 413.17(b)(3)(1997)………………………………. 42

42 C.F.R. § 413.17(c)(1)……………………………………………….... 38

*42 C.F.R. § 413.134……………………………………………… 33, 37

42 C.F.R. § 413.134(a)(2)(1997)……………………………………….. 2

42 C.F.R. v 413.134(b)(2)(1997)…………………….... 17, 18, 19, 20, 22, 30, 48

42 C.F.R. § 413.134(f)(1)(1997)………………………………………... 3

42 C.F.R. § 413.134(f)(2)……………………………………………… 3

42 C.F.R. § 413.134(f)(2)(iv)……………………………………... 17, 18, 21, 37

42 C.F.R. § 413.134(k)(2)(i)(1997)…………………………………… 3, 38

42 C.F.R. § 413.134(k)(2)(ii)………………………………... 4, 13, 36

44 Fed. Reg. 6912, 6914, Feb. 5, 1979……..……………………………… 36

67 Fed. Reg. 43762, 43764, June 28, 2002………………………………... 34

## Administrative Authorities

Nhuss Trust v. Comm'r, T.C. Memo 2005-236 (T.C. 2005)……………..…… 19

MIM §4502.6……………………………………………………………… 4

*PM A-00-76………...…4, 12, 15, 16, 18, 19, 26, 27, 28, 29, 30, 31, 33, 34, 35, 36

PRM 104.24 (May 2000)…………………………………………… 3, 4, 28

## Legislative History

H.R. Rep. No. 100-391(1), 100th Cong., 1st Sess. (1987),
*Reprinted in* 1987 U.S. Code Cong. & Admin. News 2313-250……................... 31

## Other Authorities

APB No. 16…………………………………..………………………….... 48

Black's Law Dictionary 1635 (9th ed. 2009)…………………………………...... 28

Fed. R. Civ. P. 56(c)(1)………………………………………………………… 49, 51

Fed. R. Civ. P. 56(e)(2)……………………………………………………….. 50

LCvR 7(b)……………………………………………………………………... 50

LCvR 7(d)……………………………………………………………………... 50

LCvR 7(h)(2)……....…………………………………………………..… 50

* Authorities upon which we chiefly rely are marked with asterisks.

## GLOSSARY

APB --- Accounting Principles Board

Administrator -- Administrator of the Center for Medicare and Medicaid Services

CHW -- Catholic Healthcare West

CHW-CC -- Catholic Healthcare West-Central Coast

CMS -- Center for Medicare and Medicaid Services

Marian -- Marian Medical Center

MIM -- Medicare Intermediary Manual

Mercy -- Mercy Healthcare Ventura County

PRRB -- Provider Reimbursement Review Board

PRM -- Provider Reimbursement Manual

PM -- Program Memorandum

Secretary - Secretary of Health and Human Services

## JURISDICTIONAL STATEMENT

The United States District Court for the District of Columbia had jurisdiction over this action under 42 U.S.C. §1395oo(f). This Court has jurisdiction over this proceeding under 28 U.S.C. § 1291, as an appeal from a final decision of the United States District Court for the District of Columbia.

This appeal is taken from the order of the United States District Court for the District of Columbia, dated January 29, 2013, granting Defendant's Motion for Summary Judgment. The appeal from these orders was timely filed on March 25, 2013.

This appeal is from a final order of the United States District Court for the District of Columbia, disposing of all the parties' claims.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutory and regulatory provisions are set forth in the Addendum bound with this brief.

## STATEMENT OF THE ISSUES PRESENTED

(1) Did the Secretary act in accordance with agency regulations in holding that the cost methodology was the only appropriate method to determine whether reasonable consideration was exchanged between the merging parties?

(2)  Was the Secretary justified in holding that arm's length bargaining did not occur because Marian was motivated by non-monetary considerations in its selection of a merger partner?

(3) Was the Secretary's application of Program Memorandum A-00-76 impermissibly retroactive?

(4) Did the Secretary err in holding that the merging parties were related entities?

<u>STATEMENT OF FACTS</u>

A.     <u>Statutory And Regulatory Framework</u>

Under the Medicare Act (the "Act"), 42 U.S.C. § 1395 et seq., health care providers are permitted to claim depreciation of property and equipment as a reimbursable cost. 42 U.S.C. § 1395f(b)(1); 42 U.S.C. § 1395x(v)(1)(O).  An asset's depreciable value is initially set at its "*historical cost*," generally equal to the purchase price, which is then prorated over its estimated useful life. 42 C.F.R. § 413.134(a)(2) (1997) and § 413.134(b)(1)(1997).1  In other words, the annual allowance for depreciation is generally equal to the actual cost of the asset divided by the number of years of its useful life, and then multiplied by the percentage of

---

1 We refer throughout this brief to the 1997 version of the regulations because the merger transaction occurred on April 24, 1997. Congress eliminated the depreciation adjustment with respect to transactions occurring after December 1, 1997.  Balanced Budget Act (BBA) of 1997, Pub. L. 105-33, Section 4404.

the asset's use devoted to Medicare services.   *St. Luke's Hosp. v. Sebelius*, 611

F.3d 900, 901 (D.C. Cir. 2010).

However, the amount by which an asset is annually depreciated is only an

estimate of that asset's value. *Forsyth Mem. Hosp., Inc. v. Sebelius*, 639 F.3d 534,

536 (D.C. Cir. 2011).  The Medicare Act states that "*retroactive corrective*

*adjustments*" shall be made where the aggregate reimbursement for depreciation

proves to be either inadequate or excessive. 42 U.S.C. 1395x(v)(1)(A). The

Secretary's regulations provide for this depreciation adjustment when a provider

disposes of its assets through a statutory merger, but only if the merger was "*a*

*bona fide sale*." 42 C.F.R. § 413.134(k)(2)(i)(1997), cross-referencing 42 C.F.R. §

413.134(f)(2).

The Secretary assumes that more depreciation occurred than originally

estimated when a provider sells a Medicare-depreciable asset at a loss, and in such

cases provides additional reimbursement to the provider. On the other hand, the

Secretary recaptures the additional depreciation previously paid if the sale results

in a gain.  *Lake Med. Ctr. v. Thompson*, 243 F.3d 568, 569 (D.C. Cir. 2001); 42

C.F.R. § 413.134(f)(1)(1997).

The regulations do not specifically define the term "*bona fide sale*."

However, the term has been defined in the Provider Reimbursement Manual

("PRM"), which states that a "*bona fide sale*" contemplates an "*arm's length*

3

*transaction between a willing and well informed buyer and seller, neither being under coercion, for reasonable consideration.*"   PRM 104.24 (May 2000).

This definition was further elaborated upon in Program Memorandum ("PM") PM A-00-76 issued by the Secretary on October 19, 2000.  JA at 290-293. This memorandum states that unlike for profit mergers, many "*non-profit mergers and consolidations have only the interests of the community-at-large to drive the transaction."*  JA at 292. The PM states that non-monetary factors, such as whether the new entity will continue the religious mission of its predecessor, or whether the new entity will continue to provide free care to the indigent, may not be considered in determining the reasonableness of consideration. Id.   The PM further states that the determination of whether reasonable consideration was paid should be based on the cost of the merged entity's assets, as opposed to the market value of those assets. JA at 293.

The Secretary's regulations also prohibit any revaluation of assets when a merger is between two or more related entities.  42 C.F.R. § 413.134(k)(2)(ii). See also Medicare Intermediary Manual (MIM) §4502.6 (Medicare program policy permits a revaluation of assets acquired in a statutory merger between unrelated parties). PM A-00-76 has elaborated upon this prohibition by stating that the determination of whether parties are related will be based not only on whether the parties were related prior to the merger. Rather, CMS may also consider whether

4

the parties became related on the basis of post-merger relationships, including whether there was a continuity of control between the merged entity and the surviving corporation. JA at 291-292.

B. <u>The Merger Agreement</u>

The dispute in this case arose from a merger agreement between Marian Medical Center (Marian), Catholic Healthcare West (CHW), and Mercy Healthcare Ventura County (Mercy).  Marian was a general acute care hospital located in Santa Maria, California. JA at 25.  Prior to the merger, Marian was owned and operated by the Sisters of St. Francis of Penance and Christian Charity, a province of an international Franciscan congregation (Sisters of St. Francis).  <u>Id</u>.

Mercy Healthcare Ventura County (Mercy) was a two hospital system consisting of St. Johns Regional Medical Center and Pleasant Valley Hospital. JA at 25. Catholic Healthcare West (CHW) was the sole corporate member of Mercy. CHW is a Catholic health care system co-sponsored by several Catholic religious orders.  CHW oversees and coordinates the activities of a health care system consisting of over 30 acute care hospitals in California, Arizona, and Nevada. <u>Id</u>.

CHW, Marian Medical Center, and Mercy Healthcare Ventura County, entered into a statutory merger under California law, effective as of April 24, 1997, with Mercy, renamed CHW-Central Coast (CHW-CC), remaining as the surviving

5

corporation.  JA at 25.  Under the Merger Agreement, Mercy as the surviving

corporation assumed Marian's liabilities. JA at 132.

The reasons for the merger were stated in a letter from Marian's Chief

Executive Officer and the Sisters of St. Francis to the local community dated May

23, 1995.  In this letter, the Sisters and Marian's CEO stated as follows:

> *Based on our investigations over the last several months, we*
> *believe that a few systems will dominate the State within 3 to 5*
> *years ....The next logical step is to consider affiliation with a strong*
> *statewide Catholic system, and we have been doing that for the past*
> *several months. Our conclusion: we are announcing today that we are*
> *pursuing an affiliation with Catholic Healthcare West (CHW), California's*
> *largest Catholic system ........ One of the principal reasons we have focused*
> *on CHW is our firm belief that, with this group, we have the best assurance*
> *that the mission, presence, and sponsorship of the Sisters of St. Francis can*
> *be most effectively preserved and enhanced."*

AR at 84-85.

Marian was clearly motivated by its desire to ensure the continuation of its

religious mission in selecting CHW as its merger partner.  The attorney

representing Marian during the merger negotiations with CHW, testified as follows

before the PRRB:

> *Q. Was there ever to the best of your knowledge discussions to just put the*
> *hospital on the market and see who would pick it up, see who might be*
> *interested?*
> *A. No, I think there were no such discussions because the Sisters wanted to*
> *maintain the religious nature of the facility.*

JA at 88 (Tr. at 78).2

The following exchange also occurred later in the attorney's testimony

before the PRRB:

> *Q. There was never really an open market negotiation for other potential*
> *merger partners or buyers in this situation, correct?*
> *A. Well, the only time that would ever arise is if you were going to sell or*
> *merge with a for-profit organization, and that was never the objective of the*
> *Sisters.*
> *Q. Okay. So they wanted their mission...*
> *A. They wanted their mission to continue. They wanted to continue to serve*
> *the community in Santa Maria to the best of their ability, and they did not*
> *wish to merge or sell to a for-profit organization.*

JA at 69 (Tr. 113-114).

The desire to continue Marian's religious mission was a principal, albeit not

sole reason for its selection of CHW as its merger partner. The decision to merge

with CHW was also based upon the fact the latter was a larger health care system

which provided access to significant borrowing capability, managed care contracts,

and other business and administrative savvy.  JA 45-46; 97-98.

Following several years of sometimes acrimonious discussions, Marian and

CHW signed a merger agreement on March 15, 1997.  JA at 126.  The following is

from the merger agreement:

> "*Section 3.6 Acknowledgement of Charitable Trust. The parties*
> *acknowledge and agree that the assets of [Marian] are impressed with a*

---

2 The transcript of the PRRB hearing at pages 77-79 were obscured in the
administrative record furnished by the agency. See JA 60.  Readable copies of
transcript pages 77-79 are contained in JA 87-89.

> *charitable trust, in accordance with the laws of the State of California, and that following the Closing Date, such assets will be used in a manner consistent with said trust*."

JA at 131.

The articles of incorporation of the surviving corporation reflect the adherence of the successor entity to Marian's religious mission, stating as follows:

> *The purposes for which this corporation is organized are exclusively charitable, within the meaning of Section 501(c)(3) of the Internal Revenue Code of 1986, as amended (the "Code "), and, in furtherance of these purposes and consistent with the official teachings of the Roman Catholic Church, this corporation may:(1) Serve the health ministry of the Roman Catholic Church and carry out its mission.*

JA at 213.

The consideration paid by CHW at the time of the merger consisted of the assumption of Marian's liabilities, which at the time of the merger were estimated to be approximately $36.7 million.[3] JA at 25-26. On February 22, 1999, an independent appraisal was made of the value of Marian's assets as of April 24, 1997 by Valuation Counselors. JA at 259. The appraisal by Valuation Counselors was the only appraisal conducted in this case. Based on the cost approach, the independent appraisal valued Marian's assets in the amount of approximately

---

3 After the merger, Marian's liabilities originally estimated at $36.7 million were reduced to $32.7 million. JA at 25-26. The record does not indicate the reason this occurred. However, there is nothing in the record which would indicate that either party had knowledge at the time of the merger of any facts which would have lead them to conclude that the initial estimate of Marian's liabilities was incorrect.

8

$51.1 million.4  JA at 268.  Under the market approach, the appraisal set the

overall value of the hospital at $37 million, which was virtually identical to the

consideration the parties believed would be paid when they entered into the merger

agreement.  JA at 273.  Under the income approach, the overall value of the

hospital was set at $28.5 million.5  JA at 281.

The independent appraisal concluded that a combined income/market

approach should be used, and arrived at a final valuation of the hospital in the

amount of $35,280,000 ($30,000,000 + $5,280,000). JA at 282.  Based on the

independent appraisal, a significant disparity does not exist between the

consideration paid by CHW (originally estimated at $36.7 million but later reduced

to $32.7 million), and the appraised fair market value of approximately $35.3

million.6

---

4 The CMS Administrator determined the total fair market value of Marian
equaled $67 million by adding the appraised figure of $51.1 million worth of
depreciable assets to $15.9 million of current assets.  JA at 27.

5 Valuation Counselors also prepared a draft fair market value appraisal at the time
of the merger.  JA at 230-234.  The draft appraisal was based on February 26, 1997
draft financial statements, which were then the most current financial data
available to the hospital.  Id.  This draft appraisal was incorporated by the parties
into the merger agreement and served as the basis for allocating the consideration
to the assets to be merged.  The draft appraisal assigned a total value to Marian of
approximately $36.7 million, which was very close to the final appraised value of
$37 million based on the market approach. JA at 234

6 The appraisal also determined the value of individual assets by subtracting
working capital and investments from the total purchase price. The resulting figure

In addition to the consideration paid by CHW in the form of assumption of Marian's liabilities, the merger agreement also required that CHW pay for an extensive bed replacement project at the Marian facility. Merger Agreement at JA 138-141, ¶5.4; ¶5.5. This project was necessitated by the requirement to comply with California seismic standards. JA at 101. The cost of this bed replacement project represented a significant obligation on the part of CHW, with a total project cost estimated at $104 million. JA at 47. CHW's commitment to the bed replacement project was a "*major inducement*" in obtaining Marian's agreement to the merger. JA at 139, ¶5.5; JA at 69 (Tr. 114).

With respect to the issue of the relatedness of the parties, the Administrator found that the record was "lightly developed" as to whether there was a continuity of control between the merged corporation, i.e., Marian, and its successor entity. JA at 28. The Administrator specifically noted that there was no evidence pertaining to the pre and post-merger management teams of Marian Medical Center. Id. at fn. 35.

However, it is clear that there was very little commonality between the pre-merger board of directors of Marian and the post-merger board of its successor entity, i.e., CHW-CC. The merger agreement stipulated that the Sisters of St.

---

($3.9 million) was then compared to the total value of the assets based on the cost approach ($51.1 million) to yield a percentage allocation factor 7.6% (3.9/51.1). This 7.6% was then applied to the value of individual assets based on the cost approach to determine the value of that asset. JA at 282-283.

Francis would be provided with only one out of a total of 16 seats on the board of

CHW-CC. Merger Agreement at JA 134, ¶4.1.1. A comparison of the

composition of the CHW-CC board with the former board of Marian indicates that

only one of Marian's board members, Sister Sheral Marshall, joined the CHW-CC

board. Compare directory of CHW-CC board, at JA 251-252, with Marian board

at JA 243.

Paragraph 4.1.1 of the merger agreement states of the 16 directors of the

surviving entity, four shall be representatives of the Santa Maria Campus. JA at

134. The intent of this provision was to ensure local representation by including

individuals on the board who are residents of the local community. Id. There is

nothing in the administrative record that would suggest these four community

representatives had any relationship with either the Sisters of St. Francis, or the

former Marian Medical Center.

C.  The Present Litigation

Marian claimed a loss on the disposal of its assets resulting from the merger

on its terminating cost report. JA at 36. The amount of this loss consisted of the

difference between the consideration paid for the merger, as allocated to the

individual assets of the hospital, and the cost of those assets. JA at 282-283. The

fiscal intermediary engaged by the Secretary to administer the Medicare program

disallowed the loss claimed by Marian.

11

Pursuant to 42 U.S.C. §1395oo, Marian appealed the intermediary's determination to the Provider Reimbursement Review Board (hereinafter "Board" or "PRRB").  On November 3, 2010, the PRRB upheld the intermediary's determination.  JA 31-44.  The PRRB held that the merger was between unrelated parties.  However, the PRRB held that the criteria, which were used by Marian in selecting a merger partner, did not consider obtaining a fair price for its assets.  Rather, the PRRB ruled that the Marian's motive was to "*ensure the continuation of the religious mission of the hospital*."  JA at 43.  Applying the cost methodology, the PRRB held that there was a large disparity between the value of Marian's assets and the amount paid for those assets, and that the merger was therefore not a "*bona fide sale*." JA at 44.

Pursuant to 42 U.S.C. §1395oo(f), the CMS Administrator has authority to review the determination of the PRRB.  The Administrator agreed with the Board that fair market value was not paid because the criteria used by Marian to select a merger partner was based on its desire to maintain the religious mission of the hospital.  JA at 26.  Based upon PM A-00-76, the Secretary also concluded that the cost method of valuing assets was "*the only appropriate method to use under Medicare rules*." JA at 27.   The Administrator concluded that the CHW's assumption of liabilities in the amount of $32.7 million was not reasonable consideration for Marian's assets worth $67 million using the cost methodology.

The Administrator also reversed the Board by concluding that the parties were related on the basis of post-merger relationships, and therefore the loss could not be allowed pursuant to 42 C.F.R. § 413.134(k)(2)(ii). JA at 27-29.

Pursuant to 42 U.S.C. §1395oo(f), the provider appealed the Administrator's decision by filing an action in federal district court within 60 days.  The district court held that CHW did not pay reasonable consideration for the merger as indicated by the substantial disparity between the value of the liabilities assumed, and the fair market value of the hospital's assets as computed under the cost methodology.  *Catholic Healthcare West v. Sebelius*, 2013 U.S. Dist. LEXIS 11320 (D.D.C. 2013).  This appeal timely followed.

<u>SUMMARY OF ARGUMENT</u>

The Administrator relied exclusively on the cost methodology in determining whether reasonable consideration was paid by CHW for the assets of Marian.  However, exclusive reliance on the cost methodology was inconsistent with the Secretary's regulations. As a result of the Secretary's rigid adherence to the cost approach, the Secretary failed to even consider the alternative valuation of Marian's assets contained in an independent appraisal. This appraisal established that reasonable consideration was paid by CHW for the assets of Marian.  The Secretary's failure to consider all relevant factors justifies reversal of the agency's final decision under the arbitrary and capricious standard of review. *Citizens to*

13

*Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971) (noting that a court

must "*consider whether the decision was based on a consideration of the relevant*

*factors and whether there has been a clear error of judgment*.").

The Administrator further concluded that the negotiations between CHW

and Marian were not at arm's length because continuation of Marian's religious

purpose was a primary factor in its selection of CHW as its merger partner.

However, the charitable trust impressed upon Marian's assets required that any

successor entity use these assets in a manner consistent with Marian's religious

mission. As a result, Marian's board could not have put the hospital up for sale on

the open market to the highest bidder. Rather, Marian was obligated to ensure that

any successor entity adhere to the fundamental requirements of its religious

mission, including a commitment to providing healthcare to poor and

disadvantaged persons. The Secretary's finding that Marian could only consider

price in its selection of a merger partner was clearly erroneous.

The Administrator's determination that CHW and Marian were related

entities was incorrect because it was based on an examination of post-merger

relationships, as opposed to the circumstances that existed prior to the merger.

Moreover, there was no factual basis for the Administrator's determination that the

parties were related to each other, even assuming that the determination of

relatedness could be based on post-merger relationships.

14

The Secretary's determination in this case was based upon the application of PM A-00-76.  However, this was improper because the PM is inconsistent with the regulations, and in any event was not promulgated as required by law.

## ARGUMENT

A.  Standard of Review

Decisions of the CMS Administrator are subject to judicial review under the provisions of the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 et seq. 42 U.S.C. § 1395oo(f)(1).  Under the APA, a court must set aside agency action, which is arbitrary or capricious, not consistent with the Medicare statute or regulations, or is unsupported by substantial evidence.  5 U.S.C. § 706(2)(A)(E). The APA requires the reviewing court to engage in a "thorough, probing, in-depth review." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971), overruled on other grounds by *Califano v. Sanders*, 430 U.S. 99, 105 (1977).

The Court of Appeals reviews decisions of the CMS Administrator on a de novo basis. Accordingly, this Court conducts its review as if the case were brought before the Court on direct appeal from the agency.  *Tenet Healthsystems Healthcorp v. Thompson*, 254 F.3d 238, 244 (D.C. Cir. 2001).  The district court's decision is not entitled to any particular deference. *Biloxi Regional Medical Center v. Bowen*, 835 F.2d 345, 349 (D.C. Cir. 1987).

CMS Administrator decisions may be upheld only on the basis of the

reasons relied upon by the agency itself.  The Court may not consider post hoc

rationalizations offered by government counsel. See e.g., *Chamber of Commerce of*

*the United States v. SEC,* 412 F.3d 133, 143 (D.C. Cir. 2005); *Biloxi Regional*

*Medical Center v. Bowen*, 835 F.2d 345, 348 n.12, 351 n.18, (D.C. Cir. 1987).

When an agency relies upon multiple grounds in support of its decision, and

at least one of those grounds is deficient, the court will vacate the order unless it is

certain that the agency would have adopted it even in the absence of the deficient

rationale. *Williams Gas Processing-Gulf Coast Co., L.P. v. FERC*, 475 F.3d 319,

330 (D.C. Cir. 2006) (when only one of two grounds asserted is valid, agency

decision cannot be upheld unless the decision indicates the relative weight

accorded to the two grounds); *Int'l Union, United Mine Workers v. Dep't of Labor*,

358 F.3d 40, 44-45 (D.C. Cir. 2004) (court was not "free to guess" what the agency

would have done had it known that it could not justify its decisions on the basis of

two out of the three grounds asserted).

B. The Secretary Exclusive Reliance Upon The Cost Methodology In Determining
Whether Reasonable Consideration Was Paid Was Inconsistent With The
Secretary's Regulations

Based upon PM A-00-76, the Secretary concluded that the cost method of

valuing assets was "*the only appropriate method to use under Medicare rules*." JA

at 27.  In reaching this flawed conclusion, the Secretary relied upon both 42 C.F.R.

16

§ 413.134(f)(2)(iv) and Program Memorandum A-00-76. *Id.* However, 42 C.F.R.

§ 413.134(f)(2)(iv) (1997) does not mandate reliance on the cost methodology. To

the contrary, the Secretary's regulations presume that fair market value will

generally be determined on a market based approach, as opposed to a cost

methodology. 42 C.F.R. § 413.134(b)(2)(1997). To the extent that Program

Memorandum A-00-76 mandates reliance upon the cost methodology as the

exclusive valuation method, it is inconsistent with the definition of fair market

value at 42 C.F.R. § 413.134(b)(2)(1997). The agency failed even to consider the

alternative valuations of Marian Medical Center contained in the independent

appraisal due to its inflexible and rigid reliance upon the cost approach as the

exclusive valuation method.

    Contrary to the Administrator's holding, there is nothing in the provisions of

42 C.F.R. § 413.134(f)(2)(iv) which mandates reliance upon the cost methodology

as the exclusive valuation method. Indeed, this provision does not even mention

the cost methodology of asset valuation. Rather, 42 C.F.R. § 413.134(f)(2)(iv)

merely requires the allocation of a lump sum sales price to individual assets in

accordance with whatever method the parties agree to, or in the absence of such an

agreement, as allocated by an independent appraisal. In this case, the allocation of

the lump sum sales price to Marian's individual assets was made in accordance

with the independent appraisal, as required by the regulations at 42 C.F.R. §
413.134(f)(2)(iv) (1997).  JA at 283.

Moreover, PM A-00-76 is simply inconsistent with the regulatory definition
of fair market value at 42 C.F.R. § 413.134(b)(2)(1997).  The PM notes that the
three most commonly used methodologies to determine fair market value are the
"*cost approach*," the "*market approach*," and the "*income approach*."  JA 292-
293.  According to the PM, the market approach is based upon an "*an estimate of
value by comparing the entity being valued to sales of similar businesses*."   The
income approach is based upon an analysis of "*the predicted future stream of
incom*e."  The cost approach is based upon an analysis of the cost of "*the
individual assets of the business.*"  The PM notes that "*the market approach and
the income approach produce a valuation of the business enterprise as a whole,
without regard to the individual fair market values of the constituent assets*."   The
PM concludes that the "*cost approach is the most appropriate methodology to be
used in establishing the fair market value of the assets sold*." Id.

In marked contrast to PM A-00-76, the Secretary's regulations define fair
market value as follows:

> *The price that the asset would bring by bona fide bargaining between well-*
> *informed buyers and sellers at the date of acquisition.  Usually the fair*
> *market price is the price that bona fide sales have been consummated for*
> *assets of like type, quality, and quantity in a particular market at the time of*
> *acquisition.* (emphasis added).

18

42 C.F.R. § 413.134(b)(2)(1997). 7

The market based approach is at the heart of the definition of fair market value contained in 42 C.F.R. § 413.134(b)(2)(1997). As described by PM A-00-76, the market approach is based upon an "*an estimate of value by comparing the entity being valued to sales of similar businesses*." JA 292-292. However, PM A-00-76 explicitly rejects the regulatory definition of fair market value by mandating exclusive reliance on a cost based methodology. As such, the PM cannot be squared with the regulations. *See, e.g., Paralyzed Veterans of Am. v. D.C. Arena L.P.*, 117 F.3d 579, 584 (D.C. Cir. 1997) (agency interpretations of their regulations will not be sustained if plainly inconsistent with the regulation).8

To be clear, appellant is not asserting that the Secretary was precluded by virtue of 42 C.F.R. § 413.134(b)(2)(1997) from taking into account the valuations

----

7 The definition of fair market value contained in 42 C.F.R. § 413.134(b)(2)(1997) is similar to the definition of fair market value contained in the Internal Revenue Code regulations. These regulations define fair market value as "*the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having a reasonable knowledge of the relevant facts*." 26 C.F.R. § 1.170-1(c). See also 26 C.F.R. §1.148-5(d)(6). Under tax law principles, it is well established the "best evidence of fair market value is an actual sale of the property in an arm's-length transaction." *Nhuss Trust v. Comm'r, T.C. Memo* 2005-236 (T.C. 2005). In *United States v. Cartwright*, 411 U.S. 546, 551 (1973), the Supreme Court stated the "willing buyer-willing seller test of fair market value is nearly as old as the federal income, estate, and gifts taxes themselves."

8 The market based approach is also consistent with real life experience. For example, the value of a home is generally based on the market price, as opposed to the cost of the home to the seller.

produced by the cost methodology. Rather, appellant is asserting that the

Secretary's _exclusive_ reliance on the cost methodology as the only permissible

valuation method was inconsistent with 42 C.F.R. § 413.134(b)(2)(1997). As a

result of this error, the Secretary failed to even consider the alternative valuation

approaches which were contained in the administrative record.

Appropriately, the D.C. Circuit has never interpreted the Secretary's

regulations as mandating use of a cost methodology, to the exclusion of the income

and market approaches, for the purpose of determining fair market value. In

_Forsyth Mem. Hosp., Inc. v. Sebelius_, 639 F.3d 534 (D.C. Cir. 2011), this Court

upheld the Secretary's reliance upon the cost method of determining fair market

value based upon the "_appellants' failure to introduce or identify any evidence_

_tending to contradict the accuracy of those figures_." Id. at 539. The D.C. Circuit

thus explicitly left open the possibility of accepting a valuation methodology other

than cost, when the provider, as it did in this case, furnished alternative valuations

based on the income or market approaches.

There is ample evidence that CHW paid reasonable consideration for the

assets of Marian Medical Center when using the market or income approaches. An

independent appraisal was made of the value of Marian's assets as of April 24,

1997 by Valuation Counselors. JA at 259. The appraisal by Valuation Counselors

was the only appraisal conducted in this case.9  This appraisal calculated the value

of Marian's assets using three separate methodologies, i.e., (1) a reproduction

(replacement) cost approach; (2) an income approach, and (3) a market approach.

Under the market approach, the appraisal valued the hospital at $37 million,

which was virtually identical to the consideration the parties believed would be

paid when they entered into the merger agreement.  JA at 273.  Under the income

approach, the hospital was valued at $28.5 million, which was considerably less

than the amount actually paid by CHW.  JA at 281.  Based on the cost approach,

the independent appraisal valued Marian's depreciable assets in the amount of

approximately $51.1 million.  JA at 268.  This figure was based on the depreciated

reproduction cost of non-current assets.

The independent appraisal recognized the fair market value determination

varied significantly depending upon which of these three methodologies were

employed, yet concluded the income and market approaches were the most

appropriate methods to value the hospital, with the exception of Construction in

Progress and Vacant Sites.  The independent appraisal stated as follows:

> *The Market and Income approaches for the hospital are mutually supportive and represent the economic realities of the current hospital business. We therefore conclude that the market value of the subject hospital, including working capital as of April 24, 1997, is $30,000,000.*

---

9 By failing to request a different appraisal, the fiscal intermediary should be deemed to have accepted the conclusions in the appraisal conducted by Valuation Counselors. 42 C.F.R. § 413.134(f)(2)(iv) (1997).

JA at 282.

The independent appraisal then stated the Construction in Progress and Vacant Sites accounts should be valued using the cost approach, which resulted in a valuation of $5,280,000 for these two items. In summary, the independent appraisal concluded that the total fair market value of the hospital as of April 24, 1997 equaled $35,280,000 ($30,000,000 + $5,280,000). JA at 282. 10. The independent appraisal therefore supports appellant's contention that fair market value was paid for the assets of Marian Medical Center.

The agency adamantly refused to consider the independent auditor's conclusions due to its rigid and inflexible adherence to the cost methodology as the only valid valuation technique. The Secretary has therefore failed to adhere to the obligation to make findings and render conclusions on "*all the material issues of fact, law, or discretion presented on the record.*" 5 U.S.C. § 557(c)(3)(A).

Finally, the Merger Agreement contained an express commitment on the part of CHW to undertake a substantial bed replacement project. Merger Agreement, ¶5.4 at JA 138. This commitment was a "*major inducement*" to Marian's agreement to enter into the merger. Merger Agreement, ¶5.5 at JA 139. The bed

---

10 The independent appraisal further determined the "lump sum sale/purchase price" of $36,762,000 is "most indicative of the fair market value of the Hospital's assets within the meaning of the …fair market value definition" contained in 42 C.F.R. § 413.134(b)(2). JA at 259-260.

replacement project represented a significant obligation, with a total cost estimated at $104 million. JA at 47.   However, the CMS Administrator failed to even consider this expense in deciding whether reasonable consideration was exchanged.

Under the arbitrary and capricious standard of review, a court must "*consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment*."  *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971).  An agency's decision may be supported by substantial evidence, and still be overturned under the arbitrary and capricious standard, if it fails to take into consideration all of the relevant factors. *Bowman Transp., Inc. v. Arkansas-Best Freight System, Inc*., 419 U.S. 281, 284 (1974), *Trailways, Inc. v. Interstate Commerce Com*., 673 F.2d 514, 517 (D.C. Cir. 1982).  The Secretary's failure to even consider alternative measures of fair market value justifies reversal under this standard of review.

C. The Fact That Marian Was Motivated By Non-Monetary Considerations In Its Selection Of A Merger Partner Did Not Require Disallowance Of The Depreciation Loss Adjustment

The agency concluded that the merger agreement was not an arm's length transaction because Marian's selection of a merger partner was based on non-monetary factors such as maintaining its religious mission. JA at 26.  This conclusion ignores the fact that the assets of Marian were impressed with a

charitable trust, and pursuant to the terms of that trust, Marian was obligated to ensure that any successor entity continue to operate the hospital in accordance with Catholic healthcare principles.  JA at 131.  Marian adhered to this obligation by virtue of the fact that its successor entity was similarly committed to the healthcare tenets of the Catholic Church, including most specifically the cardinal principle of providing health care to poor, underserved, and disadvantaged individuals. Article 4(A)(7) at JA 214; Article 4(B) at JA 215.  See also Sponsorship Agreement at ¶ 2.01(f), JA 51-52.

Marian could not legally have placed itself for sale to the highest bidder on the open market.  The Secretary's determination amounts to nothing more than a finding that Marian did not engage in arm's length negotiations simply because it adhered to the legal requirements of the charitable trust impressed upon its assets.

The Supreme Court of California has upheld the charitable trust doctrine, noting that the assets of a charitable corporation are by operation of law impressed with a constructive trust, even in the "absence of any express declaration by those who contribute such assets as to the purpose for which the contributions are made." *Pacific Home v. County of Los Angeles*, 41 Cal. 2d. 844, 852; 264 P. 2d 539 (1953).  In *Pacific Home*, the Supreme Court of California ruled that once assets are acquired by a charitable organization, those assets must be "irrevocably dedicated" to the charitable purpose.  Id.

24

As noted in *People v. Orange County Charitable Services*, 87 Cal. Rptr. 2d 253, 73 Cal. App. 4th 1054, 1074 (1999), a complete range of equitable remedies are available to vindicate the public's interests in ensuring that assets impressed with a charitable trust are used solely for purposes recognized as valid under the terms of the trust.  Under California's Uniform Supervision of Trustees for Charitable Purposes Act, the Attorney General is charged with the supervision of charitable corporations and with enforcing the terms of charitable trusts.  Cal. Gov. Code § 12598.

An action to enforce the terms of a charitable trust may be brought by an officer or director of the charitable corporation, as well as the Attorney General. Cal. Corp. Code § 5142.  See also Cal. Corp. Code § 5250 (an action brought by the Attorney General to enforce the terms of a charitable trust shall be instituted in the name of the State of California).   California has traditionally pursued a "vigorous watchdog policy" in supervising charitable trusts.  Van Nuys v. United States, 75-2 U.S. Tax Cas. (CCH) P13,081; 1975 U.S. Dist. LEXIS 13036, *24.

California law further provides that a nonprofit healthcare facility may not be sold or its assets otherwise transferred to a for-profit corporation or entity without the prior written consent of the Attorney General. Cal. Corp. Code § 5914. Among the factors to be considered by the Attorney General in deciding whether to approve the transaction is "whether the proposed use of the proceeds from the

agreement or transaction is consistent with the charitable trust on which the assets are held….” Cal. Corp. Code § 5917(e).  See also *Queen of Angels Hospital v. Younger*, 66 Cal. App. 3d 359; 136 Cal. Rptr. 36 (Cal. App. 2d Dist. 1977) (proceeds derived by a hospital sponsored by a religious order from a lease to a for-profit entity must be used for the purpose of operating an inpatient facility which comports with the mission of the religious order).

The CMS Administrator’s decision was made in reliance upon PM A-00-76, which states that in a bona fide sale, *“[t]he seller’s main objective is to maximize the consideration received and the seller would not be expected to be interested in who the buyer is except for the buyer’s ability to pay.”* JA at 292. However, under this interpretation, Marian could never have been sold for fair market value, because Marian’s trustees were required by law to select a merger partner who would continue adherence to the Catholic healthcare principles under which Marian was organized.

A similar situation confronted the court in *Jeanes Hosp. v. Sec'y of HHS*, 2011 U.S. App. LEXIS 20951(3d Cir. 2011).  In *Jeanes*, the Secretary asserted the depreciation loss adjustment was unavailable because the selection of the merger partner was based on non-monetary factors.  The court held that arm’s length bargaining occurred, notwithstanding that the motivation for the merger was based on non-price factors, such as continuation of the Quaker mission of Jeanes.   As

26

noted by the court, the trustees of non-profit entities have a fiduciary obligation to take into account non-monetary factors in discussions with merger partners. The court held that the loss adjustment resulting from a statutory merger would never be available to non-profit entities, if it were to uphold the Secretary's interpretation that non-monetary factors may not be taken into account in merger negotiations. The court held that the Secretary may not interpret her regulations in such a way as to "*render the loss adjustment unavailable in most if not all merger situations, regulating it out of existence*." *Jeanes*, 2011 U.S. App. LEXIS 20951 at 11-12 (citing to *UPMC-Braddock Hosp. v. Sebelius*, 592 F.3d 427, 438 (3rd Cir. 2010).

The Secretary held that Marian could not obtain the loss adjustment due to its use of non-monetary criteria in selecting a merger partner. However, as noted in *Jeanes*, charitable organizations such as Marian and CHW cannot be motivated by purely monetary considerations given the fiduciary responsibilities of their trustees.  PM A-00-76 effectively eliminates the depreciation loss adjustment for non-profit entities because by definition these entities must take into account non-monetary factors in any merger negotiations.  See e.g. Cal. Corp. Code § 9111, stating that nonprofit religious corporations may be formed "primarily or exclusively for religious purposes."

Moreover, there was ample evidence in the administrative record that the merger resulted from an arm's length negotiation.  An arm's length transaction is

"a transaction negotiated by unrelated parties, each acting in his own self-interest."

JA at 12, citing to PRM 104.24. See also Black's Law Dictionary 1635 (9th ed.

2009) (defining an "arm's length transaction" as "a transaction between two

unrelated and unaffiliated parties."). See also CMS Program Memorandum PM A-

00-76, which defines an arm's-length transaction as "a transaction negotiated by

unrelated parties, each acting in its own self-interest." JA at 292.

     As will be discussed below, the parties to the merger were not related, based

upon circumstances existing either pre-merger or post-merger.  The Secretary has

presented no evidence of collusion between the parties.  There is nothing in the

record that would suggest that CHW was in a position to coerce Marian into

signing the merger agreement.

     To the contrary, there is ample evidence supporting arm's length bargaining

between Marian and CHW.  The merger agreement was executed by Marian only

after a due diligence review had been conducted. JA at 63 (Tr. 91), 106.  The

attorney who represented Marian in the merger transaction testified that Marian

had discussions with organizations other than CHW.  JA at 59 (Tr. 76); JA at 87-89

(Tr. 77-79); JA 62 (Tr. 87-88); JA 65 (Tr. 98-99).   The merger negotiations

between Marian and CHW were quite contentious. JA 57-58 (Tr. 68-70); JA 68-69

(Tr. 112-113). Each party was represented by separate counsel.  JA 58 (Tr. 70).  In

fact, the negotiations completely broke down at certain points due to the

contentious nature of those discussions, as a result of which it took almost two years to complete the merger. JA 68-69 (Tr. 112-113).

In sum, the Secretary's conclusion that arm's length negotiations between the merging parties did not occur because Marian was not offered for sale on the open market was arbitrary and capricious. By virtue of its religious mission, Marian was obligated to choose a merger partner who was committed to Catholic healthcare tenets, including the fundamental principle of providing free care to poor and underserved individuals. The government's failure to take this material issue into account in arriving at its final decision was arbitrary and capricious. 5 U.S.C. § 557(c)(3)(A); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971) (under the arbitrary and capricious standard of review, a court must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.")

D. The Agency Failed To Publish Notice Of PM A-00-76 In The Federal Register As Required By 42 U.S.C. § 1395hh(c)(1)

Based upon PM A-00-76, the Secretary concluded that the cost method of valuing assets was "*the only appropriate method to use under Medicare rules*." JA at 27. The Secretary's reliance upon PM A-00-76 in declining to consider any alternative valuation methodologies was improper because the PM was never promulgated as required by law.

29

In the present case, the agency had an established interpretation of the term "*fair market value*" as reflected in 42 C.F.R. § 413.134(b)(2).  This provision states that fair market value is "*usually*" the sales price for assets of *"like type, quality, and quantity in a particular market at the time of acquisition."*  42 C.F.R. § 413.134(b)(2)(1997).  By way of contrast, under PM A-00-76, fair market value is <u>never</u> based on the market approach, but rather is <u>always</u> based on the cost methodology. As interpreted by the CMS Administrator, PM A-00-76 mandates use of a cost methodology to determine fair market value in every merger involving non-profit hospitals, without taking into consideration individual circumstances.  See CMS Administrator's decision at JA 27 (noting the cost approach "*as explained in the PM….is the <u>only</u> appropriate method to use under Medicare rules.*"). (emphasis added).

The notice and comment provisions of the APA apply not only to the original promulgation of a regulation, but also to amendments thereof. 5 U.S.C. § 551(5).  As a result, once an agency establishes an interpretation of a regulation, that interpretation may not subsequently be modified except through notice and comment rulemaking. *Paralyzed Veterans of America v. D.C. Arena L.P.*, 117 F.3d 579, 586 (D.C. Cir. 1997).  ). Further, an agency may not circumvent this requirement by "adopting a de facto amendment to its regulation through adjudication*." Marseilles Land & Water Co. v. FERC,* 345 F.3d 916, 920 (D.C.

Cir. 2003). Accordingly, the significant changes to the definition of fair market

value brought about by PM A-00-76 may not be applied to this transaction because

the PM was not issued as a result of notice and comment procedures.

Moreover, publication in the Federal Register would still be required even if

the PM was merely a clarification or interpretation of an existing rule. Under the

Medicare Act, there is a requirement for formal rulemaking with respect to rules

establishing a "*substantive legal standard*." 42 U.S.C. § 1395hh(a)(2). This

mirrors the APA requirement for notice and comment in promulgating substantive

rules. 5 U.S.C. § 553. In addition, there is a separate publication requirement

under the Medicare Act with respect to issuances that do not rise to the level of

"*substantive legal standards*." 42 U.S.C. § 1395hh(c)(1). The latter provision

states in pertinent part as follows:

> *The Secretary shall publish in the Federal Register, not less frequently than*
> *every 3 months, a list of all manual instructions, interpretive rules,*
> *statements of policy, and guidelines of general applicability which -- (a) are*
> *promulgated to carry out this title, but (b) are not published [through notice*
> *and comment rule making] and have not been previously published in a list*
> *under this section.*

The legislative history clarifies the intent of Congress in enacting these

provisions. The Committee Report noted that any policy of general applicability,

which has a significant impact upon providers, is subject to notice and comment

rulemaking. H.R. Rep. No. 100-391(1), 100th Cong., 1st Sess. at 430-31 (1987),

*Reprinted in* 1987 U.S. Code Cong. & Admin. News 2313-250. The Committee

31

further noted that there may yet remain issuances which are not required to be promulgated through formal rulemaking procedures.  The Committee stated as follows with respect to these issuances:

> *While the Committee does not believe that these need to be published in the Federal Register, the Committee does believe that interested parties should at least know of their existence, so they can seek further information if they desire.  Therefore, the Committee bill would require the Secretary to publish a list of such policies in the Federal Register.  The Committee expects the Secretary to devise some way of categorizing or indexing such issuances in a manner that will make it convenient for interested parties to determine their pertinence.*

<u>Id</u>.

In sum, there are two separate publication requirements under the Medicare statute. There is the notice and comment publication requirement with respect to issuances establishing a "*substantive legal standard.*" 42 U.S.C. § 1395hh(a)(2). There is also a separate notice only requirement with respect to any other "*interpretive rules, statements of policy, and guidelines of general applicability.*" 42 U.S.C. § 1395hh(c)(1). The Medicare Act further precludes the Secretary from enforcing any substantive change in *"…manual instructions, interpretive rules, statements of policy, or guidelines of general applicability"* prior to satisfying the publication requirement. 42 U.S.C. § 1395hh(e)(1).11

---

11 The Freedom of Information Act ("FOIA") also requires that "*statements of general policy*" and "*interpretations of general applicability*" be published in the Federal Register. 5 U.S.C. § 552(a)(1)(D). Failure to make the required publication precludes the adverse use of any such issuance against a party, unless that party has

PM A-00-76 promulgates three guidelines of general applicability.  First, it states that the "cost approach" must be used to determine the valuation of an entity. JA 293. The PM further announces the general principle that the determination of whether parties are related should be based on both pre-merger and post-merger relationships.  JA 291.  The PM also states that non-monetary factors, such as the desire to preserve a hospital's religious mission, may not be taken into account in determining the reasonableness of the consideration. JA 292.  There can be no doubt that PM A-00-76 specified generally applicable guidelines, as evidenced by the fact that its provisions have been applied by the Secretary in numerous other cases. See e.g. *Pinnacle Health Hosps. v. Sebelius*, 681 F.3d 424 (D.C. Cir. 2012); *Jeanes Hosp. v. Sec'y of HHS*, 448 Fed. Appx. 202, 2011 U.S. App. LEXIS 20951 (3rd Cir. 2011); *St. Luke's Hosp. v. Sebelius*, 611 F.3d 900 (D.C. Cir. 2010).

PM A-00-76 is also an interpretive rule, as it explains or clarifies the regulations at 42 C.F.R. § 413.134 and 42 C.F.R. § 413.17.  *Chippewa Dialysis Servs. v. Leavitt*, 511 F.3d 172, 176 (D.C. Cir. 2007) (an interpretative rule "*construe[s] an agency's substantive regulation*") (citing *Syncor International Corp. v. Shalala,* 127 F.3d 90, 94 (D.C. Cir. 1997)).  Finally, PM A-00-76 is a statement of policy, even if it does not fall within the definition of an interpretive rule or a guideline of general applicability.  Under the APA, statements of policy

---

"*actual and timely notice of the terms thereof*."  *Secretary of Labor, Mine Safety & Health Admin. v. Western Fuels-Utah, Inc*., 900 F.2d 318, 327 (D.C. Cir. 1990).

have been defined as a non-binding issuance adopted by an agency for the purpose of advising the public as to how an agency proposes to exercise a discretionary power. *Syncor Int'l Corp. v. Shalala,* 127 F.3d 90, 94 (D.C. Cir. 1997).

The agency implements 42 U.S.C. § 1395hh(c)(1) by issuing a list of all of its manual instructions and interpretive regulations in a document entitled "*Quarterly Listing of Program Issuances*." The first listing of PM A-00-76 in the Federal Register occurred on June 28, 2002, which was approximately 5 years after the closing of the merger.  See 67 Fed. Reg. 43762, 43764, June 28, 2002. Accordingly, the Medicare Act prohibited the Secretary from applying the PM with respect to the merger in this case, because the PM was not listed in the *Quarterly Listing of Program Issuances* until after the merger transaction had already been completed.  42 U.S.C. § 1395hh(e)(1).12

Moreover, the prohibition against the retroactive application of guidelines of general applicability and interpretive rules contained in 42 U.S.C. § 1395hh(e) applies in the context of both agency adjudications as well as rulemaking.  The Medicare Act states that a change to an interpretive rule or a guideline of general applicability "*shall not be applied*" prior to the date of its publication, without

---

12 In *St. Luke's Hosp. v. Sebelius*, 611 F.3d 900, 907 (D.C. Cir. 2010), the court held that PM A-00-76 was not impermissibly retroactive.  However, there was no discussion in that case of the provisions of 42 U.S.C. § 1395hh.  *Doe v. Exxon Mobil Corp.*, 2011 U.S. App. LEXIS 13934 (D.C. Cir. 2011 (conclusion assumed *sub silentio* in prior case is not precedent).

distinguishing between the adjudicatory and rulemaking contexts.  42 U.S.C. §

1395hh(e)(1)(A).  Further, with respect to any change to an interpretive rule or

guideline of general applicability, *"[n]o action shall be taken against a provider of*

*services or supplier with respect to noncompliance with such a substantive change*

*for items and services furnished before the effective date of such a change*." 42

U.S.C. § 1395hh(e)(1)(C).  The term "*no action*" clearly encompasses any action

by the agency, whether resulting from adjudication, rulemaking, or other type of

proceeding.

The Administrator's decision was explicitly premised upon the application

of the PM. JA 17-20, JA 27.  This Court should reverse the Administrator's

decision because it improperly relied upon a Program Memorandum, which was

promulgated in violation of the requirements of 42 U.S.C. § 1395hh(c)(1).

Finally, there is no requirement for showing actual prejudice to the provider

when alleging that the agency violated the Medicare Act's prohibition against the

retroactive application of interpretive rules and guidelines of general applicability.

However, there can be no doubt that such prejudice in fact occurred.  The

reimbursement impact of the depreciation expense claimed by plaintiffs is

significant. JA at 297.  As CMS recognized when promulgating the depreciation

regulations, the ability to claim the loss adjustment resulting from revaluation of

assets in statutory merger cases is certainly a factor which businesspeople will take

into account in deciding whether to undertake such a merger.  See 44 Fed. Reg. 6912, 6914 (Feb. 5, 1979).  The Preamble further states that the regulation will do nothing to discourage statutory mergers between unrelated parties, "*since it allows the revaluation of assets for those transactions*." Id.

The ability to claim the depreciation losses would naturally have been a factor in the parties' evaluation of the economic benefits of the merger transaction. It was therefore of critical importance that the parties have been made aware prior to the merger of the additional limitations imposed on the ability to claim the loss adjustment resulting from PM A-00-76.

E. The Parties To The Merger Were Not Related Entities

(1) The Secretary Improperly Applied a "Continuity of Control" Analysis in Determining That the Parties to the Merger Were Related

The regulations at 42 C.F.R. § 413.134(k)(2)(ii) provide that no revaluation of assets is permitted in the case of a merger between two related parties.  The CMS Administrator determined that Marian and CHW were related parties, by virtue of post-merger events, which resulted in a "*continuity of control*" between the merged and the new entity. JA 27-29.

In *UPMC-Braddock Hosp. v. Sebelius*, 592 F.3d 427 (3rd Cir. 2010), the court held that the term "*related*" as defined at 42 C.F.R. § 413.17 mandates that the determination of whether merging parties are related be based solely on circumstances existing prior to the merger. *Id*. at 438.  The court further noted that

it is logically impossible for the merged corporations to be related to each other on the basis of post-merger events, because the merged corporation ceases to exist after the merger transaction. The court also noted that in merger transactions, one or more of the merging parties will nearly always control the resulting or surviving corporation. As a result, relatedness will always exist under the Secretary's interpretation, thereby making it impossible for a party to obtain the loss adjustment permitted by the regulations. *Id*. The court therefore found that that the Secretary's interpretation would defeat the purpose of the regulation at 42 C.F.R. § 413.134, which is to allow the surviving corporation to revalue the assets that it acquired from the merged corporation.

In *Via Christi Reg'l Med. Ctr., Inc. v. Leavitt*, 509 F.3d 1259, 1273-1274 (10th Cir. 2007), the Tenth Circuit also rejected the argument that the regulations permit a finding of relatedness on the basis of a "*continuity of control*" between the extinguished and the surviving corporation. The court held that the regulations at 42 C.F.R. § 413.17 and 42 C.F.R. § 413.134 permit the Secretary to find that the merging corporations are related solely on the basis of whether such relatedness existed prior to the merger.

The Secretary's regulations state "[i]f the statutory merger *is between* two or more corporations that *are* unrelated (as specified in § 413.17), the assets of the merged corporation(s) acquired by the surviving corporation may be revalued..."

37

42 C.F.R. § 413.134(k)(2)(i) (emphasis added).  As noted in *UPMC-Braddock Hosp*, the use of the present tense in this regulation indicates the relatedness determination should be based on the circumstances existing at the time of the transaction, and not on the basis of circumstances that may arise after the merger has been completed.  *UPMC-Braddock Hosp.* 592 F.3d at 438.

Moreover, the Secretary's regulations defining the term "related" supports this conclusion.  Thus, 42 C.F.R. § 413.17(b), states as follows:

> *Related to the provider means that the provider to a significant extent is associated or affiliated with or has control of or is controlled by the organization furnishing the services, facilities, or supplies [to the provider]. . . . Control exists if an individual or an organization has the power, directly or indirectly, significantly to influence or direct the actions or policies of an organization or institution.* (Emphasis added)

Once again, these regulations also refer to the concept of relatedness in the present tense.  Accordingly, the relevant inquiry is whether the parties are related to each other at the time of the transaction being scrutinized.

Indeed, the very structure of the related party regulations clearly forecloses the Secretary's interpretation.  Thus, 42 C.F.R. § 413.17(b)(1) starts with the basic definition that relatedness exists between a provider and an "organization furnishing the services, facilities, or supplies" to that provider.  These regulations also note "[i]ndividuals and organizations associate with others for various reasons and by various means."  42 C.F.R. § 413.17(c)(1) (emphasis added).  As explained by the Secretary, these regulations provide "control 'exists if an individual or an

38

organization has the power, directly or indirectly, significantly to influence or direct the actions or policies' of _another._" See Def. Mem. at 33-34 (citing to 42 C.F.R. § 413.17(b)(3). (emphasis added).

The basic thrust of the related party analysis formulated by the Secretary's regulations is there are two entities involved in a related party analysis, and one of these entities is owned or controlled by another. The only way in which one entity can own or control another entity is if both entities are in existence at the same time.  Accordingly, the related party analysis must necessarily be based on the relationship that exists between two or more entities in existence at the same time.

However, Marian ceased to exist post-merger.  Accordingly, any related party analysis involving Marian must necessarily be based solely on pre-merger relationships.

There is no doubt the Secretary could redraft the definition of related parties to encompass the broader "continuity of control" concept upon which the CMS Administrator determined that the parties were related.  JA at 28-29.  Under the "continuity of control" concept, the definition of "related" could be satisfied on the ground that the same individuals or organizations, which controlled the prior extinguished entity, also control the surviving entity.  However, the Secretary has not amended her regulations, notwithstanding two appellate decisions, which have stated that these regulations must be amended if the Secretary wishes to implement

39

a "continuity of control" concept of relatedness.  *Via Christi Reg'l Med. Ctr., Inc.*, 509 F.3d at 1273; *UPMC-Braddock Hosp.,* 592 F.3d at 437.

> (2) There Was No Evidence of Continuity of Control between Marian and CHW-CC, Even Assuming Such an Analysis Could Be Applied

The record does not establish that the parties were related, even if the Secretary was correct in holding that relatedness can be determined on the basis of post-merger events.   The CMS Administrator admitted that the record was "*lightly developed*" with respect to whether a continuity of control existed between Marian and CHW.  JA at 28.  The Administrator found that the reserved rights granted to Marian's ecclesiastical sponsor "shows a continuing ownership influence of some extent over the real property." JA at 28 (emphasis added).

The very language of the Secretary's conclusion reflects ambiguity as to the extent of any such influence.  It is noteworthy that the rights reserved to the ecclesiastical sponsor were to be exercised in accordance with the CHW governance matrix. JA at 130.  However, this matrix was not even included in the administrative record.   Based on the existence of a "*lightly developed*" record, the CMS Administrator should have remanded for further fact finding to the Board. See 42 C.F.R. § 405.1875(f)(2), authorizing the Administrator to remand to the Board for further development of the factual record.13

---

13 Ordinarily, judicial review in an APA case is confined to the administrative record; neither party is entitled to supplement that record with evidentiary material

The CMS Administrator nonetheless found the existence of a "*continuity of control*" between the merged and the new entity on the basis of the following facts: (1) retention by Marian's ecclesiastical sponsor of certain rights to approve any subsequent dispositions of the hospital facilities; (2) the presence of certain Marian trustees on the surviving entity's Board of Trustees, (3) the existence of a promissory note under which Marian agreed to pay $25,000,000 for the refinancing of its debt and (4) the fact that transaction was treated as a "*pooling of interest*" for financial purposes. JA at 28-29. However, these factors do not constitute grounds for the Secretary's finding that a "*continuity of control*" existed between the merged and surviving corporations.

The Administrator held that Marian and its successor entity were affiliated by virtue of the retention by Marian's ecclesiastical sponsor of its "*Canonical Stewardship of Ecclesiastical Property*." JA at 28. As used in the merger agreement, the term "*Canonical Stewardship*" is defined as "*the fiduciary responsibility, imposed by Canon Law, of a religious institute for the Ecclesiastical*

---

that was not considered by the agency. *Camp v. Pitts*, 411 U.S. 138, 142-143, 36 L. Ed. 2d 106, 93 S. Ct. 1241 (1973); *Environmental Defense Fund, Inc. v. Costle*, 657 F.2d 275, 284-86 (D.C. Cir. 1981); *Doraiswamy v. Secretary of Labor*, 555 F.2d 832, 839-42 (D.C. Cir. 1976). Therefore, it would be inappropriate for either party to supplement the record in this case with materials that were not considered by the CMS Administrator. Rather, the Administrator's decision must be vacated and the matter remanded to the agency for further evidentiary development, if the existing record is inadequate for judicial review. *Camp v. Pitts*, 411 U.S. at 143.

*Property of that religious institute*." JA at 128.    The term "*Ecclesiastical*

*Property*" is defined as the assets *"that constitute the temporal goods belonging,*

*by operation of Canon Law, to a religious institute."* JA at 129.  The Merger

Agreement provides as follows

> *The Sisters of St. Francis, shall in accordance with the reserved rights set forth in the CHW Governance Matrix, have the right to approve any actions that constitute an alienation of Ecclesiastical Property contributed by the Sisters of St. Francis, including without limitation, the sale, lease, mortgage, or encumbrance of the Santa Maria Campus facilities."*

JA at 130.

The contours of the authority granted by virtue of this provision are unclear,

because the CHW Governance Matrix was not included in the administrative

record.  However, the authority granted to Marian's ecclesiastical sponsor by virtue

of this provision was not of a discretionary nature, but was instead narrowly

limited by the requirements of Cannon Law.  JA at 130.  This is no different from

any standard contract clause mandating adherence to applicable law by the

contracting parties.  This provision merely allowed the Sisters to enforce the terms

of the constructive trust impressed upon Marian's assets, which in any event would

have been authorized by operation of law even had such a provision not been

included in the contract. Cal. Corp. Code § 5142.

Pursuant to 42 C.F.R. § 413.17(b)(3)(1997), *"Control exists if an individual*

*or an organization has the power, directly or indirectly, significantly to influence*

*or direct the actions or policies of an organization or institution."* The ecclesiastical rights retained by the Sisters were limited only to a narrow class of circumstances involving alienation of ecclesiastical property. These rights did not provide the Sisters with operational control over the day to day activities of the hospital.

The other factors cited by the Administrator also do not establish that the parties were related. The CMS Administrator notes that Marian's ecclesiastical sponsor continued to provide sponsorship services to the new entity. JA at 28. However, these services were not related in any way to operational or managerial services. Rather, these services involved pastoral counseling, consultation, and educational assistance related to the religious tenets of the Roman Catholic Church. See JA at 223, Sponsorship Agreement, Article 2.01(b). Moreover, the fee paid for these sponsorship services was minimal; i.e. 0.125 percent of the budgeted operating expense of Marian Medical Center. JA at 225. A fee of such a minimal amount does not reflect any sharing of profits, which would be indicative of joint management or control.

Moreover, the Sisters of St. Francis held neither title nor any other ownership interest in any of the real property comprising the Santa Maria Campus, either directly or indirectly through a subsidiary entity. See ¶ 9.1.10(a) of the Merger Agreement, noting that title to all real property was vested exclusively in

Marian, except as specifically provided therein.  JA at 152. Absent legal title or

some other ownership interest, it is impossible to see exactly how the Sisters

allegedly controlling influence could be exerted.

Equally important, nothing in the administrative record suggests the Sisters

had any economic interest in any of the Ecclesiastical Property subject to reserved

rights.  Absent legal title, the Sisters of St. Francis would not be in a position to

benefit financially from any of its reserved rights involving the "sale, lease

mortgage or encumbrance of the Santa Maria campus facilities."  JA at 130.  Nor is

there any indication in the administrative record that the Sisters of St. Francis

would share any of the income generated by the facilities comprising the Santa

Maria campus.

In short, the Sisters have no economic interest in the Santa Maria Campus,

or any other assets of CHW, with the sole exception of a nominal sponsorship fee,

i.e. 0.125 percent of the budgeted operating expense of Marian Medical Center. JA

at 225.  Rather, the only interest of the Sisters in the Santa Maria Campus is of a

purely philosophical/religious nature, involving the proper application of Catholic

teachings.

Moreover, the composition of the board of directors of the surviving entity

does not demonstrate a continuity of control with the merged entity.  The CMS

Administrator's decision suggests that 4 out of 18 of the CHW-CC board members

may also have been trustees of Marian.  JA at 28.  However, four out of eighteen board members would hardly be sufficient to establish control.  *See UPMC-Braddock v. Sebelius,* 592 F.3d 427, 439, fn. 13 (the presence of 6 out of 18 members on the Board of the successor entity who were appointed by an affiliate of the merged entity was not sufficient to establish control).  *See also Jeanes Hosp. v. Leavitt*, 453 F. Supp. 2d 888, 901-02 (E.D. Pa. 2006) (a minority position on the Board of Directors is insufficient to establish "*significant*" control for purposes of the regulations at 42 C.F.R. § 413.17).

In any event, a comparison of the composition of the CHW-CC Board with the former trustees of Marian indicates that only one of Marian's trustees, Sister Sheral Marshall, joined the CHW-CC board.14  Compare directory of CHW-CC Board, at JA 251-252, with Marian Board at JA 243. As the CMS Administrator concedes, the presence of one former trustee of Marian on the 18 member Board of the newly formed CHW-CC does not even remotely demonstrate a continuity of control between the extinguished and the surviving entity. JA at 28. It is also

---

14 The following is from the PRRB testimony of the attorney who represented Marian during the merger negotiations at JA 58 (Tr. 71):
*Q. At the time of the negotiations, were any members of the Marian Board of Trustees also a member of any CHW entity?*
*A. No.*
*Q. And following completion of the statutory merger, were any members of the Marian board of trustees added to the board of the surviving entity, Central Coast?*
*A. I believe that there was one Sister who was a member of the board of Marian who became a member of the board of Mercy Health Care.…*

45

noteworthy that the only common trustee of both Marian and CHW-CC was a Sister. This further demonstrates that Marian's sole interest in its successor was not to exert operational control, but rather to preserve the Catholic mission of the facility.15

   The Administrator further determined that a Promissory Note executed by Marian in favor of the surviving entity indicates that the parties were related pre-merger.  JA at 29. However, the promissory note does not support a pre-merger relationship between the parties.

   The promissory note was a requirement of the Merger Agreement itself. The purpose of this provision was to refinance Marian's long term debt obligations to the City of Santa Maria.  See Article 7.1 of the Merger Agreement at JA 143. Pursuant to the terms of the Merger Agreement, Marian was loaned $30 million for the purpose of ensuring that funds would be available to pay its existing bondholders.  Id.  This loan was to be evidenced by a Promissory Note to be executed by Marian "*on or before the Closing Date*." Id.  The merger agreement further states that following the Closing Date, the promissory note "*shall be reflected as an intra-company loan*."  Id.

---

15 The Administrator did not find that continuity of control existed based on similarities between Marian's management team and the management team of the surviving corporation.  Indeed, the Administrator noted that there is no evidence in the administrative record concerning this issue.   JA at 28, fn. 35.

46

The promissory note was executed on April 24, 1997. JA at 235.  This was the same day as the Closing Date specified in the Merger Agreement.  See Section 8.1 of the Merger Agreement at JA 144.  Thus, Marian ceased to exist at the exact moment it executed the note.  The loan to Marian and the accompanying Promissory Note were simply requirements of the merger agreement itself.  The Promissory Note was nothing more than an intra-company loan attendant to the execution of the merger agreement. Under these circumstances, the promissory note does not evidence any form of pre-merger relationship between the parties.

Finally, the CMS Administrator states that the fact that the merger transaction was treated as a "*pooling of interest*" for financial purposes reflects a continuity of control between Marian and CHW. JA at 29.  However, the "pooling of interest" method of accounting is perfectly appropriate in a merger between unrelated parties.

The Secretary relies upon Accounting Principles Board (APB) No. 16 in concluding that use of the pooling of interest method demonstrates that the parties to the merger were related. JA at 22.   However, the relevant APB states as follows:

> The pooling of interests method of accounting is intended to present as a single interest two or more common stockholder interests *which were previously independent* and the combined rights and risks represented by those interests.

47

See APB No. 16, Paragraph 45, p. 17. (emphasis added).16

F. Evidence Contained in the Independent Appraisal was Timely Presented in Plaintiff's Opposition Brief

The district court stated that plaintiff argued for the first time in its reply brief that the Secretary should have evaluated the reasonableness of the consideration based on the $35.28 million appraised valuation of Marian's assets. JA at 480 (fn.11). The district court indicated that this argument should not be considered because it was not raised in plaintiff's opening brief. As noted by the district court, $35.28 million represented the independent appraiser's valuation of Marian's assets. See *Catholic Healthcare West v. Sebelius*, 2013 U.S. Dist. LEXIS 11320, Fn. 11 (JA 480).

Plaintiff argued in its opening brief that the amount most indicative of fair market value was the price resulting from arm's length negotiations between the parties; i.e. $36.7 million. Pl. Mem., Docket No. 14, pp. 13-15 (JA 320-322). Plaintiff also asserted that the Secretary's exclusive reliance upon the cost method of valuation was inconsistent with the regulatory definition of fair market value contained in 42 C.F.R. § 413.134(b)(2)(1997). Pl. Mem., Docket No. 14, pp. 16-18 (JA 323-325). It is correct that plaintiff's opening brief asserted that the fair

16 A copy of the relevant APB may be found at http://clio.lib.olemiss.edu/cdm/ref/collection/aicpa/id/272 (last accessed July 29, 2013).

market value of Marian's assets was the price agreed to by the parties (JA at 322),

i.e. $36.7 million, as opposed to the $35.28 million determined by the appraisal.

(JA 282). However, it was abundantly clear from plaintiff's opening brief that it

was challenging both the method used by CMS in valuing Marian's assets, as well

as the $67 million valuation produced by that method. Accordingly, material

pertaining to the independent audit contained in plaintiff's opposition brief was not

new argument, but rather additional evidence supporting plaintiff's initial

argument that the Secretary incorrectly valued Marian's assets.

More importantly, the district court overlooked the critical fact that evidence

based on the independent appraisal was first raised by plaintiff in a *combined*

*opposition/reply* brief, as opposed to merely a reply brief. The district court

ordered that plaintiff's opposition and reply briefs be combined into a single

document. See Docket No. 12, Order dated July 25, 2011 (JA 298-299). 17

Pursuant to Fed. R. Civ. P. 56(c)(1) and LCvR 7(h)(2), plaintiff was required

to file a separate statement of facts in its opposition brief disputing any factual

_____

17 As required by the district court's procedures, plaintiff's combined opposition
and reply briefs generated two separate docketing events, i.e., one for the reply
brief (Doc. No. 17), and another for the opposition brief (Doc. No. 18). See
District Court Docket Entries at JA 3. See also Civil Filing Pointers, paragraph 13,
available at http://www.dcd.uscourts.gov/dcd/ecf-filing-pointers (last accessed July
29, 2013), requiring two docketing events when filing combined opposition and
reply briefs.

allegations contained in the Secretary's summary judgment motion.18  Failure to

dispute the Secretary's factual allegations could have resulted in their deemed

admission. Fed. R. Civ. P. 56(e)(2).  These provisions codify the requirement that

the filing of a motion for summary judgment shifts the burden onto the party

opposing that motion to produce credible evidence in contravention of the

movant's allegations.  *Laningham v. United States Navy*, 813 F.2d 1236, 1241

(D.C. Cir. 1987).19

The Secretary's motion for summary judgment asserted that reasonable

consideration was not exchanged because the value of Marian's assets was $67

million.  See JA 347, 356, 360-362, 370-371, Def. Motion for Summary Judgment,

Docket No. 16.  In her motion for summary judgment, the Secretary further argued

that plaintiff failed to provide evidence supporting any alternative to the $67

million valuation used by the Administrator. JA 374-375.

Plaintiff's combined opposition/reply brief was its *first* responsive pleading

to the Secretary's motion for summary judgment.  Pursuant to Fed. R. Civ. P.

_____

18 LCvR 7(h)(2) specifically applies to actions for review of agency action based
on the administrative record. Therefore, the fact that this is an APA review case
did not relieve plaintiff of its obligation to submit a separate statement of facts in
its opposition brief contravening the factual allegations in the Secretary's summary
judgment motion.
19 Under the local court rules, filing of an opposition to a motion for summary
judgment is mandatory, whereas the filing of a reply brief is optional. LCvR 7(b),
LCvR 7(d).

56(c)(1) and LCvR 7(h)(2), it was plaintiff's obligation in its opposition brief to rebut the Secretary's factual allegations pertaining to the value of Marian's assets. Plaintiff therefore appropriately cited to the $35.28 million valuation contained in the independent appraisal as record evidence contravening the allegation in the Secretary's motion for summary judgment that Marian's assets should be valued at $67 million. See Pl. Stmt. of Facts, Docket No. 18, pp. 3-5 (JA 399-401). The evidence contained in the independent appraisal was therefore timely presented by plaintiff for purposes of opposing the Secretary's summary judgment motion, regardless of whether or not that same evidence was set forth in plaintiff's own motion for summary judgment.

There is no question that plaintiff would have had the right to present evidence pertaining to the independent appraisal in its opposition brief had plaintiff not filed any motion for summary judgment. Plaintiff could not possibly have lost this right by virtue of filing its own summary judgment motion. Any decision to the contrary by the district court was a clear abuse of discretion.

Further, the agency had ample opportunity in its reply brief to respond to issues relating to the independent appraisal raised in plaintiff's opposition brief. Indeed, the Secretary did provide such a response in her reply brief. See Def. Mem. at pp. 6-10, Docket No. 19, JA 445-449. Nor did the Secretary ever assert that the agency was prejudiced by the fact that the findings of the independent

51

appraisal were first raised by plaintiff in its opposition brief.  Indeed, the Secretary

never asked the district court to exclude any argument by plaintiff based on the

evidence contained in the independent appraisal.

The submission of new arguments or evidence in a reply brief is clearly

disfavored because the opposing party would not normally have an opportunity to

respond.  *Board of Regents of the Univ. of Wash. v. EPA*, 86 F.3d 1214, 1221 (D.C.

Cir. 1996).  However, the Secretary had ample opportunity to respond (and did

respond) in its reply brief to the material concerning the independent appraisal

contained in plaintiff's opposition brief.  Accordingly, even if plaintiff's opposition

brief was merely a reply brief (which it most certainly was not), the material

contained in the independent appraisal should be considered by this Court in

determining whether the Secretary's determination constituted arbitrary and

capricious agency action.

## CONCLUSION

For the foregoing reasons, the judgment of the District Court should be

reversed.  This Court should hold that Marian is entitled to the depreciation loss

adjustment claimed in its cost report. Alternatively, this case should be remanded

to the Secretary for further proceedings consistent with this Court's opinion.

Respectfully Submitted


/s/ Jeffrey A. Lovitky
_____
JEFFREY A. LOVITKY
Attorney at Law
1776 K Street, N.W., Ste. 200
Washington, DC 20006
Telephone: (202) 429-3393
Facsimile:  (202) 318-4013


Date:  July 29, 2013

CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a)(7)(C) AND D.C. CIRCUIT RULE 32(a)

Pursuant to Fed. R. App. P. 32(a)(7)(C) and Local Rule 32, I certify that the foregoing brief contains 12,810 words excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Local Rule 32(a)(2), as determined by the Microsoft Word processing system used to prepare this brief.

Dated: July 29, 2013

/s/ Jeffrey A. Lovitky
_____

JEFFREY A. LOVITKY

# ADDENDUM – PERTINENT STATUTES AND REGULATIONS

## TABLE OF CONTENTS

**Statutes**                                                           **Page**

42 U.S.C. § 1395hh …………...…………………………………………...... 1

**Regulations**

42 C.F.R. § 413.17(1997)…………………………………………………. 6

42 C.F.R. § 413.134(1997)……………………………………………... 9

**Other Authorities**

PM A-00-76 …………………………………………..……………….… 31

i



UNITED STATES CODE SERVICE
Copyright © 2013 Matthew Bender & Company, Inc.
a member of the LexisNexis Group (TM)
All rights reserved.

*** Current through PL 113-14, approved 6/13/13 ***

TITLE 42. THE PUBLIC HEALTH AND WELFARE
CHAPTER 7. SOCIAL SECURITY ACT
TITLE XVIII. HEALTH INSURANCE FOR THE AGED AND DISABLED
PART E. MISCELLANEOUS PROVISIONS

**Go to the United States Code Service Archive Directory**

42 USCS § 1395hh

§ 1395hh.  Regulations

(a) Authority to prescribe regulations; ineffectiveness of substantive rules not promulgated by regulation.
   (1) The Secretary shall prescribe such regulations as may be necessary to carry out the administration of the insurance programs under this title [42 USCS §§ 1395 et seq.]. When used in this title [42 USCS §§ 1395 et seq.], the term "regulations" means, unless the context otherwise requires, regulations prescribed by the Secretary.
   (2) No rule, requirement, or other statement of policy (other than a national coverage determination) that establishes or changes a substantive legal standard governing the scope of benefits, the payment for services, or the eligibility of individuals, entities, or organizations to furnish or receive services or benefits under this title shall take effect unless it is promulgated by the Secretary by regulation under paragraph (1).
   (3) (A) The Secretary, in consultation with the Director of the Office of Management and Budget, shall establish and publish a regular timeline for the publication of final regulations based on the previous publication of a proposed regulation or an interim final regulation.

(B) Such timeline may vary among different regulations based on differences in the complexity of the regulation, the number and scope of comments received, and other relevant factors, but shall not be longer than 3 years except under exceptional circumstances. If the Secretary intends to vary such timeline with respect to the publication of a final regulation, the Secretary shall cause to have published in the Federal Register notice of the different timeline by not later than the timeline previously established with respect to such regulation. Such notice shall include a brief explanation of the justification for such variation.

(C) In the case of interim final regulations, upon the expiration of the regular timeline established under this paragraph for the publication of a final regulation after opportunity for public comment, the interim final regulation shall not continue in effect unless the Secretary publishes (at the end of the regular timeline and, if applicable, at the end of each succeeding 1-year period) a notice of continuation of the regulation that includes an explanation of why the regular timeline (and any subsequent 1-year extension) was not complied with. If such a notice is published, the regular timeline (or such timeline as previously extended under this paragraph) for publication of the final regulation shall be treated as having been extended for 1 additional year.

(D) The Secretary shall annually submit to Congress a report that describes the instances in which the Secretary failed to publish a final regulation within the applicable regular timeline under this paragraph and that provides an explanation for such failures.

(4) If the Secretary publishes a final regulation that includes a provision that is not a logical outgrowth of a previously published notice of proposed rulemaking or interim final rule, such provision shall be treated as a proposed regulation and shall not take effect until there is the further opportunity for public comment and a publication of the provision again as a final regulation.

(b) Notice of proposed regulations; public comment.

(1) Except as provided in paragraph (2), before issuing in final form any regulation under subsection (a), the Secretary shall provide for notice of the proposed regulation in the Federal Register and a period of not less than 60 days for public comment thereon.

(2) Paragraph (1) shall not apply where--

(A) a statute specifically permits a regulation to be issued in interim final form or otherwise with a shorter period for public comment,

(B) a statute establishes a specific deadline for the implementation of a provision and the deadline is less than 150 days after the date of the enactment of the statute in which the deadline is contained, or

(C) subsection (b) of section 553 of title 5, United States Code, does not apply pursuant to subparagraph (B) of such subsection.

(c) Publication of certain rules; public inspection; changes in data collection and retrieval.

  (1) The Secretary shall publish in the Federal Register, not less frequently than every 3 months, a list of all manual instructions, interpretative rules, statements of policy, and guidelines of general applicability which--

    (A) are promulgated to carry out this title [42 USCS §§ 1395 et seq.], but

    (B) are not published pursuant to subsection (a)(1) and have not been previously published in a list under this subsection.

  (2) Effective June 1, 1988, each fiscal intermediary and carrier administering claims for extended care, post-hospital extended care, home health care, and durable medical equipment benefits under this title [42 USCS §§ 1395 et seq.] shall make available to the public all interpretative materials, guidelines, and clarifications of policies which relate to payments for such benefits.

  (3) The Secretary shall to the extent feasible make such changes in automated data collection and retrieval by the Secretary and fiscal intermediaries with agreements under section 1816 [42 USCS § 1395h] as are necessary to make easily accessible for the Secretary and other appropriate parties a data base which fairly and accurately reflects the provision of extended care, post-hospital extended care and home health care benefits pursuant to this title [42 USCS §§ 1395 et seq.], including such categories as benefit denials, results of appeals, and other relevant factors, and selectable by such categories and by fiscal intermediary, service provider, and region.

[[(d)](e) Retroactivity of substantive changes; reliance upon written guidance

  (1) (A) A substantive change in regulations, manual instructions, interpretative rules, statements of policy, or guidelines of general applicability under this title shall not be applied (by extrapolation or otherwise) retroactively to items and services furnished before the effective date of the change, unless the Secretary determines that--

      (i) such retroactive application is necessary to comply with statutory requirements; or

      (ii) failure to apply the change retroactively would be contrary to the public interest.

    (B) (i) Except as provided in clause (ii), a substantive change referred to in subparagraph (A) shall not become effective before the end of the 30-day period that begins on the date that the Secretary has issued or published, as the case may be, the substantive change.

(ii) The Secretary may provide for such a substantive change to take effect on a date that precedes the end of the 30-day period under clause (i) if the Secretary finds that waiver of such 30-day period is necessary to comply with statutory requirements or that the application of such 30-day period is contrary to the public interest. If the Secretary provides for an earlier effective date pursuant to this clause, the Secretary shall include in the issuance or publication of the substantive change a finding described in the first sentence, and a brief statement of the reasons for such finding.

(C) No action shall be taken against a provider of services or supplier with respect to noncompliance with such a substantive change for items and services furnished before the effective date of such a change.

(2) (A) If--

(i) a provider of services or supplier follows the written guidance (which may be transmitted electronically) provided by the Secretary or by a medicare contractor (as defined in section 1889(g) [42 USCS § 1395zz(g)]) acting within the scope of the contractor's contract authority, with respect to the furnishing of items or services and submission of a claim for benefits for such items or services with respect to such provider or supplier;

(ii) the Secretary determines that the provider of services or supplier has accurately presented the circumstances relating to such items, services, and claim to the contractor in writing; and

(iii) the guidance was in error;

the provider of services or supplier shall not be subject to any penalty or interest under this title [42 USCS §§ 1395 et seq.] or the provisions of title XI [42 USCS §§ 1301 et seq.] insofar as they relate to this title [42 USCS §§ 1395 et seq.] (including interest under a repayment plan under section 1893 [42 USCS § 1395ddd] or otherwise) relating to the provision of such items or service or such claim if the provider of services or supplier reasonably relied on such guidance.

(B) Subparagraph (A) shall not be construed as preventing the recoupment or repayment (without any additional penalty) relating to an overpayment insofar as the overpayment was solely the result of a clerical or technical operational error.

[(e)](f) Report on areas of inconsistency or conflict

(1) Not later than 2 years after the date of the enactment of this subsection [enacted Dec. 8, 2003], and every 3 years thereafter, the Secretary shall submit to Congress a report with respect to the administration of this title [42 USCS §§ 1395 et seq.] and areas of inconsistency or conflict among the various provisions under law and regulation.

(2) In preparing a report under paragraph (1), the Secretary shall collect--

4

(A) information from individuals entitled to benefits under part A [42 USCS §§ 1395c et seq.] or enrolled under part B [42 USCS §§ 1395j et seq.], or both, providers of services, and suppliers and from the Medicare Beneficiary Ombudsman with respect to such areas of inconsistency and conflict; and

(B) information from medicare contractors that tracks the nature of written and telephone inquiries.

(3) A report under paragraph (1) shall include a description of efforts by the Secretary to reduce such inconsistency or conflicts, and recommendations for legislation or administrative action that the Secretary determines appropriate to further reduce such inconsistency or conflicts.

**HISTORY:**

(Aug. 14, 1935, ch 531, Title XVIII, Part E[D][C], § 1871, as added July 30, 1965, P.L. 89-97, Title I, Part 1, § 102(a), 79 Stat. 331; Oct. 21, 1986, P.L. 99-509, Title IX, Subtitle D, Part 2, § 9321(e)(1), 100 Stat. 2016; Dec. 22, 1987, P.L. 100-203, Title IV, Subtitle A, Part 2, Subpart C, § 4035(b), (c), 101 Stat. 1330-78; Aug. 5, 1997, P.L. 105-33, Title IV, Subtitle A, Ch 1, Subch A, § 4001, 111 Stat. 275; Dec. 8, 2003, P.L. 108-173, Title I, § 101(a)(1), Title IX, Subtitle A, §§ 902(a)(1), (b)(1), 903(a)(1), (b)(1), (c)(1), 904(b), 117 Stat. 2071, 2375, 2376, 2377



1 of 1 DOCUMENT

MICHIE'S CODE OF FEDERAL REGULATIONS
Copyright © 1997, Michie

TITLE 42 -- PUBLIC HEALTH
REVISED AS OF OCTOBER 1, 1997
CHAPTER IV -- HEALTH CARE FINANCING ADMINISTRATION,
DEPARTMENT OF HEALTH AND HUMAN SERVICES
SUBCHAPTER B -- MEDICARE PROGRAM
PART 413 -- PRINCIPLES OF REASONABLE COST REIMBURSEMENT;
PAYMENT FOR END-STAGE RENAL DISEASE SERVICES; OPTIONAL
PROSPECTIVELY DETERMINED PAYMENT RATES FOR SKILLED
NURSING FACILITIES
SUBPART A -- INTRODUCTION AND GENERAL RULES

42 CFR 413.17

§ 413.17 Cost to related organizations.


(a) Principle. Except as provided in paragraph (d) of this section, costs applicable to services, facilities, and supplies furnished to the provider by organizations related to the provider by common ownership or control are includable in the allowable cost of the provider at the cost to the related organization. However, such cost must not exceed the price of comparable services, facilities, or supplies that could be purchased elsewhere.

(b) Definitions -- (1) Related to the provider. Related to the provider means that the provider to a significant extent is associated or affiliated with or has control of or is controlled by the organization furnishing the services, facilities, or supplies.

(2) Common ownership. Common ownership exists if an individual or individuals possess significant ownership or equity in the provider and the institution or organization serving the provider.

(3) Control. Control exists if an individual or an organization has the power, directly or indirectly, significantly to influence or direct the actions or policies of an organization or institution.

(c) Application. (1) Individuals and organizations associate with others for various reasons and by various means. Some deem it appropriate to do so to assure a steady flow of supplies or services, to reduce competition, to gain a tax advantage, to extend influence, and for other reasons. These goals may be accomplished by means of ownership or control, by financial assistance, by management assistance, and other ways.

(2) If the provider obtains items of services, facilities, or supplies from an organization, even though it is a separate legal entity, and the organization is owned or controlled by the owner(s) of the provider, in effect the items are obtained from itself. An example would be a corporation building a hospital or a nursing home and then leasing it to another corporation controlled by the owner. Therefore, reimbursable cost should include the costs for these items at the cost to the supplying organization. However, if the price in the open market for comparable services, facilities, or supplies is lower than the cost to the supplier, the allowable cost to the provider may not exceed the market price.

(d) Exception. (1) An exception is provided to this general principle if the provider demonstrates by convincing evidence to the satisfaction of the fiscal intermediary (or, if the provider has not nominated a fiscal intermediary, HCFA), that --

(i) The supplying organization is a bona fide separate organization;

(ii) A substantial part of its business activity of the type carried on with the provider is transacted with others than the provider and organizations related to the supplier by common ownership or control and there is an open, competitive market for the type of services, facilities, or supplies furnished by the organization;

(iii) The services, facilities, or supplies are those that commonly are obtained by institutions such as the provider from other organizations and are not a basic element of patient care ordinarily furnished directly to patients by such institutions; and

(iv) The charge to the provider is in line with the charge for such services, facilities, or supplies in the open market and no more than the charge made under comparable circumstances to others by the organization for such services, facilities, or supplies.

(2) In such cases, the charge by the supplier to the provider for such services, facilities, or supplies is allowable as cost.

**HISTORY:** [51 FR 34793, Sept. 30, 1986]

**AUTHORITY:** AUTHORITY NOTE APPLICABLE TO ENTIRE PART:
Secs. 1102, 1861(v)(1)(A), and 1871 of the Social Security Act (42 U.S.C. 1302, 1395x(v)(1)(A), and 1395hh).

**NOTES:** NOTES APPLICABLE TO ENTIRE CHAPTER:
EDITORIAL NOTE: Nomenclature changes affecting chapter IV appear at 45 FR 53806, Aug. 13, 1980; 50 FR 12741, Mar. 29, 1985; 50 FR 33034, Aug. 16, 1985; 51 FR 41338, Nov. 14, 1986; 53 FR 6634, Mar. 2, 1988; 53 FR 47201, Nov. 22, 1988; 56 FR 8852, Mar. 1, 1991.



1 of 1 DOCUMENT

MICHIE'S CODE OF FEDERAL REGULATIONS
Copyright © 1997, Michie

TITLE 42 -- PUBLIC HEALTH
REVISED AS OF OCTOBER 1, 1997
CHAPTER IV -- HEALTH CARE FINANCING ADMINISTRATION,
DEPARTMENT OF HEALTH AND HUMAN SERVICES
SUBCHAPTER B -- MEDICARE PROGRAM
PART 413 -- PRINCIPLES OF REASONABLE COST REIMBURSEMENT;
PAYMENT FOR END-STAGE RENAL DISEASE SERVICES; OPTIONAL
PROSPECTIVELY DETERMINED PAYMENT RATES FOR SKILLED
NURSING FACILITIES
SUBPART G -- CAPITAL-RELATED COSTS

42 CFR 413.134

§ 413.134 Depreciation: Allowance for depreciation based on asset costs.


(a) Principle. An appropriate allowance for depreciation on buildings and equipment used in the provision of patient care is an allowable cost. The depreciation must be --

(1) Identifiable and recorded in the provider's accounting records;

(2) Based on the historical cost of the asset, except as specified in paragraph (j) of this section regarding donated assets; and

(3) Prorated over the estimated useful life of the asset using --

(i) The straight-line method; or

(ii) Accelerated depreciation under a declining balance method (not to exceed double the straight-line rate) or the sum-of-the-years' digits method in the following situations:

9

(A) Depreciable assets for which accelerated depreciation was used for Medicare purposes before August 1, 1970, including those assets for which a timely request to change from straight-line depreciation to accelerated depreciation was received by an intermediary before August 1, 1970;

(B) Depreciable assets acquired before August 1, 1970, if no election to use straight-line or accelerated depreciation was in effect on August 1, 1970, and the provider was participating in the program on August 1, 1970;

(C) Depreciable assets of a provider if construction of such depreciable asset began before February 5, 1970, and the provider was participating in the program on February 5, 1970; or

(D) Depreciable assets of a provider if a valid written contract was entered into by a provider participating in the program before February 5, 1970, for construction, acquisition, or for the permanent financing thereof, and such contract was binding on a provider on February 5, 1970, and at all times thereafter; or

(iii) A declining balance method, not to exceed 150 percent of the straight-line rate, for a depreciable asset acquired after July 31, 1970; however, this declining balance method may be used only if the cash flow from depreciation on the total assets of the institution during the reporting period, including straight-line depreciation on the assets in question, is insufficient (assuming funding of available capital not required currently for amortization and assuming reasonable interest income on such funds) to supply the funds required to meet the reasonable principal amortization schedules on the capital debts related to the provider's total depreciable assets. For each depreciable asset for which a provider requests authorization to use a declining balance method for Medicare reimbursement purposes, but not to exceed 150 percent of the straight-line rate, the provider must demonstrate to the intermediary's satisfaction that the required cash flow need exists. For each depreciable asset in which a provider justifies the use of accelerated depreciation, the intermediary must give written approval for the use of a depreciation method other than straight-line before basing any interim payment on this accelerated depreciation or making its reasonable cost determination which includes an allowance for such depreciation.

(b) General rules. (1) Historical cost. Historical cost is the cost incurred by the present owner in acquiring the asset.

(i) All providers. For depreciable assets acquired after July 31, 1970, and for a hospital or a SNF, acquired before July 18, 1984, the historical cost may not exceed the lower of current reproduction cost adjusted for straight-line depreciation over the

life of the asset to the time of the purchase or the fair market value of the asset at the time of its purchase.

(ii) Hospitals and SNFs only. (A) For assets acquired on or after July 18, 1984 and not subject to an enforceable agreement entered into before that date, historical cost may not exceed the lowest of the following:

(1) The allowable acquisition cost of the asset to the owner of record as of July 18, 1984 (or, in the case of an asset not in existence as of July 18, 1984, the first owner of record of the asset after that date);

(2) The acquisition cost of the asset to the new owner; or

(3) The fair market value of the asset on the date of acquisition.

(B) For purposes of applying paragraph (b)(1)(ii)(A) of this section, an asset not in existence as of July 18, 1984 includes any asset that physically existed, but was not owned by a hospital or SNF participating in the Medicare program as of July 18, 1984.

(C) The acquisition cost to the owner of record is subject to any limitation on historical costs described in paragraphs (b)(1)(i) or (g)(1) and (2) of this section, and is not reduced by any depreciation taken by the owner of record. This limitation on historical cost is also applied to the purchase of land, a capital asset that is neither depreciable nor amortizable under any circumstances. (See §§ 413.153(d) and 413.157(b) for application of the limitation to the cost of land for purposes of determining allowable interest expense and return on equity capital or proprietary providers.)

(D) Acquisition cost to the owner of record includes the costs of betterments or improvements that extend the estimated useful life of an asset at least two years beyond its original estimated useful life or increase the productivity of an asset significantly over its original productivity.

(E) For assets acquired prior to a hospital's or SNF's entrance into the Medicare program, the acquisition cost to the owner of record is the historical cost of the asset when acquired, rather than when the hospital or SNF entered the program.

(F) For assets subject to the optional depreciation allowance as described in § 413.139, the acquisition cost to the owner of record is the historical cost established for those assets when the hospital or SNF changed to actual depreciation as described in § 413.139(e). If the hospital or SNF did not change to actual depreciation, as described in § 413.139(e), for optional allowance assets, the acquisition cost to the owner of record is established by reference to the hospital's or SNF's recorded historical cost of the asset when acquired. If the hospital or SNF has no historical cost

11

records for optional allowance assets, the acquisition cost to the owner of record is established by appraisal.

(G) The historical cost of an asset acquired on or after July 18, 1984 may not include costs attributable to the negotiation or settlement of the sale or purchase (by acquisition, merger, or consolidation) of any capital asset for which any payment was previously made under the Medicare program. The costs to be excluded include, but are not limited to, appraisal costs (except those incurred at the request of the intermediary under paragraph (f)(2)(iv) of this section), legal fees, accounting and administrative costs, travel costs, and the costs of feasibility studies.

(iii) Hospital-based providers other than SNFs and SNF-based providers. T1For changes of ownership that involve assets of a hospital-based provider other than a SNF, or assets of a SNF-based provider, the provisions of paragraph (b)(1)(ii) of this section are not applicable. A reasonable allocation of the purchase price must be made, so that the hospital-based provider other than a SNF, or a SNF-based provider, is not affected by the limitations described in paragraph (b)(1)(ii) of this section. The historical cost of assets of providers other than hospitals and SNFs is governed by paragraph (b)(1)(i) of this section.

(2) Fair market value. Fair market value is the price that the asset would bring by bona fide bargaining between well-informed buyers and sellers at the date of acquisition. Usually the fair market price is the price that bona fide sales have been consummated for assets of like type, quality, and quantity in a particular market at the time of acquisition.

(3) The straight-line method. Under the straight-line method of depreciation, the cost or other basis (for example, fair market value in the case of donated assets) of the asset, less its estimated salvage value, if any, is determined first. Then this amount is distributed in equal amounts over the period of the estimated useful life of the asset.

(4) Declining balance method. Under the declining balance method, the annual depreciation allowance is computed by multiplying the undepreciated cost of the asset each year by a uniform rate up to double the straight-line rate or 150 percent, as the case may be (see paragraph (a)(3) of this section for limitations on use of accelerated methods of depreciation).

(5) Sum-of-the-years' digits method. Under the sum-of-the-years' digits method, the annual depreciation allowance is computed by multiplying the depreciable cost basis (cost less salvage value) by a constantly decreasing fraction. The numerator of the fraction is represented by the remaining years of useful life of the asset at the beginning of each year, and the denominator is always represented by the sum of the years' digits of useful life at the time of acquisition.

(6) Current reproduction cost. Current reproduction cost is the cost at current prices, in a particular locality or market area, of reproducing an item of property or a group of assets. Where depreciable assets are concerned, this means the reasonable cost to have built, reproduce in kind, or, in the case of equipment or similar assets, to purchase in the competitive market.

(7) Useful life. The estimated useful life of a depreciable asset is its normal operating or service life to the provider, subject to the provisions in paragraph (b)(7)(i) of this section. Factors to be considered in determining useful life include normal wear and tear; obsolescence due to normal economic and technological changes; climatic and other local conditions; and the provider's policy for repairs and replacement.

(i) Initial selection of useful life. In selecting a proper useful life for computing depreciation under the Medicare program, providers must use the useful life guidelines published by HCFA. If HCFA has not published applicable useful life guidelines, providers must use --

(A) The edition of the American Hospital Association useful life guidelines, as specified in HCFA Medicare program manuals; or

(B) A different useful life specifically requested by the provider and approved by the intermediary. A different useful life may be approved by the intermediary if the provider's request is properly supported by acceptable factors that affect the determination of useful life. However, such factors as an expected early sale, retirement, demolition or abandonment of an asset, or termination of the provider from the Medicare program may not be used.

(ii) Application of guidelines. The provisions concerning the selection of useful life guidelines described in paragraph (b)(7)(i) of this section apply to assets acquired on or after January 1, 1981. For assets acquired before January 1, 1981, providers must use the useful life guidelines published by the American Hospital Association in its 1973 edition of Chart of Accounts for Hospitals, or those published by the Internal Revenue Service, or those approved for use by intermediaries as provided in paragraph (b)(7)(i)(B) of this section.

(iii) Changing useful life. A change in the estimated useful life may be made if clear and convincing evidence justifies a redetermination of the useful life used by the provider. Such a change must be approved by the intermediary in writing, and the factors cited in paragraphs (b)(7) and (b)(7)(i) of this section are applicable in making such redeterminations of useful life. If the request is approved, the change is effective with the reporting period immediately following the period in which the provider's request is submitted for approval.

13

(8) Donated asset. An asset is considered donated when the provider acquires the asset without making payment in the form of cash, new debt, assumed debt, property or services. Except as provided in paragraph (j)(3) of this section, if a provider makes payment in any form to acquire an asset, the payment is considered the purchase price for the purpose of determining allowable historical cost.

(9) Net book value. The net book value of an asset is the depreciable basis used for the Medicare program by the asset's last participating owner less depreciation recognized under the Medicare program.

(c) Recording of depreciation. Appropriate recording of depreciation includes the identification of the depreciable assets in use, the assets' historical costs, the assets' dates of acquisition, the method of depreciation, estimated useful lives, and the assets' accumulated depreciation.

(d) Depreciation methods -- (1) General. Proration of the cost of an asset over its useful life is allowed on the straight-line method, or, when permitted under paragraph (a)(3) of this section, the declining balance or the sum-of-the-years' digits methods. One method may be used on a single asset or group of assets and another method on others. In applying the declining balance or sum-of-the-years' digits method to an asset that is not new, the undepreciated cost of the asset is treated as the cost of a new asset in computing depreciation.

(2) Change in method. Prior to August 1, 1970, a provider may change from the straight-line method to an accelerated method or vice versa, upon advance approval from the intermediary on a prospective basis with the request being made before the end of the first month of the prospective reporting period. Only one such change with respect to a particular asset may be made by a provider. Effective with August 1, 1970, a provider may only change from an accelerated method or optional method (see § 413.139) to the straight-line method. Such a change may be made without intermediary approval and the basis for depreciation is the undepreciated cost reduced by the salvage value. Thereafter, once straight-line depreciation is selected for a particular asset, an accelerated method may not be established for that asset.

(3) Recovery of accelerated depreciation -- (i) General. If a provider who has used an accelerated method of depreciation for any of its assets terminates participation in the program, or if the Medicare proportion of its allowable costs decreases so that cumulatively substantially more depreciation was paid than would have been paid using the straight-line method of depreciation, the excess of reimbursable cost determined by using accelerated depreciation methods and paid under the program over the reimbursable cost that would have been determined and paid under the program by using the straight-line method of depreciation, will be

14

recovered as an offset to current reimbursement due or, if the provider has terminated participation in the program, as an overpayment. In this determination of excess payment, recognition will be given to the effects the adjustment to straight-line depreciation would have on the return on equity capital and on the allowance in lieu of specific recognition of other costs in the respective years.

(ii) Transaction between related organizations -- (A) General. If the termination of the provider agreement is due to a change in provider ownership, as defined in § 489.18 of this chapter, resulting from a transaction between related organizations, as defined in § 413.17, and the criteria in paragraph (b) of this section are met, the excess of reimbursable cost, as determined in paragraph (d)(3)(i) of this section may not be recovered if there is a continuation of participation by the facility in the Medicare program.

(B) Criteria. The following criteria must be met if the recovery of excess reimbursable cost is not to be made:

(1) The termination of the provider agreement is due to a change in ownership of the provider resulting from a transaction between related organizations.

(2) The successor provider continues to participate in the Medicare program.

(3) Control and the extent of the financial interest of the owners of the provider before and after the termination remain the same; that is, the successor owners acquire the same per-centage of control or financial investment as the transferors had.

(4) All assets and liabilities of the terminated provider are transferred to the related successor participating provider.

(C) Effect of transaction. In transactions meeting the criteria specified in paragraph (d)(3)(ii)(B) of this section, the provision concerning recovery of excess reimbursable cost (§ 413.134(d)(3)(i)) is not applied, and the transaction is treated as follows:

(1) The successor provider must record the historical cost and accumulated depreciation and the method of depreciation recognized under the Medicare program, and these are considered as incurred by the successor provider for Medicare purposes.

(2) The Medicare program's utilization of the terminated provider is considered as having been incurred by the successor provider for Medicare purposes.

(3) The equity capital of the terminated provider as of the closing of its final cost reporting period must be wholly contained in the equity capital of the successor provider as of the beginning of its first cost reporting period.

(e) Funding of depreciation. Although funding of depreciation is not required, it is strongly recommended that providers use this mechanism as a means of conserving funds for replacement of depreciable assets. Funded depreciation account funds must be placed in readily marketable investments of the type that assures the availability and conservation of the funds. Additions to the funded depreciation account must remain in the account for at least 6 months to be considered valid funding transactions.

(1) Incentive. As an incentive for funding, investment income on funded depreciation is not treated as a reduction of allowable interest expense provided such investment income is deposited in, and becomes part of, the funded depreciation account at the time of receipt by the provider. Investment income earned on deposits before the 6-month period elapses are not offset unless the deposits are withdrawn for an improper purpose during this period. If a provider transfers assets of the funded depreciation account to a related organization (for example, pooling of several chain organization providers' funded depreciation accounts at the chain home office for investment purposes), these assets shall be treated as the provider's funds and are subject to all the requirements specified in paragraph (e) of this section.

(2) Availability of funded depreciation. (i) HCFA considers funded depreciation available for use in the acquisition or replacement of depreciable assets related to patient care unless the funded depreciation funds have been committed by contract for the acquisition of depreciable assets related to the furnishing of patient care or for other capital purposes related to patient care.

(ii) Borrowing for a purpose for which funded depreciation account funds should have been used makes the borrowing unnecessary to the extent that funded depreciation account funds were available at the time of the borrowing. Available funds in the funded depreciation account, to the extent of the unnecessary borrowing, are called "tainted" funds. Interest expense incurred on borrowing for a capital purpose is not an allowable cost to the extent that funded depreciation account funds were available at the time of the borrowing.

(iii) A provider can remove the "unnecessary" characterization of borrowing, and thereby cure tainted funded depreciation, by using the tainted funds for a proper purpose described in paragraph (e)(3)(i) of this section. However, any funded depreciation that existed at the time of the unnecessary borrowing and is not classified as tainted must be used before any of the tainted funds.

(iv) When only a portion of the borrowing is considered unnecessary under paragraph (e)(2)(ii) of this section, subsequent repayments of such borrowing from general funds are applied first to the allowable portion of the borrowing and then,

16

when all of the allowable borrowing is repaid, to the unallowable portion of the borrowing. When funds from the funded depreciation account are used for the repayment of the unnecessary borrowing, an equivalent amount of tainted funds is cured without regard to the provisions of paragraphs (e)(2)(ii) and (e)(3)(i)(C) of this section. Similarly, where general funds are used to pay for the unallowable borrowing after the necessary borrowing has been repaid, an equivalent amount of tainted funded depreciation is cured without regard to the provisions of paragraphs (e)(2)(ii) and (e)(3)(i)(C) of this section.

(3) Withdrawals of funded depreciation -- (i) Proper withdrawals. (A) Withdrawals from funded depreciation are considered proper if made either for the acquisition or replacement of depreciable assets related to the furnishing of patient care or for other capital purposes related to patient care.

(B) First-in, first-out basis. Proper withdrawals from funded depreciation are made on a first-in, first-out basis.

(C) Exception. If HCFA determines that a borrowing is unnecessary because of the existence of available funded depreciation, and additional deposits have been made to funded depreciation after the occurrence of the unnecessary borrowing, withdrawals made after the date of the additional deposits are deemed to be made on a last-in, first-out basis.

(ii) Improper withdrawals. (A) Withdrawals from funded depreciation that do not meet the requirements for proper withdrawals under the provisions in paragraph (e)(3)(i)(A) of this section are considered improper withdrawals.

(B) Improper withdrawals from funded depreciation are made on a last-in, first-out basis. If improper withdrawals are made, interest expense is reduced in accordance with section § 413.153(c)(3).

(C) Improper withdrawals will result in the offset of otherwise allowable interest expense under the offset provisions in § 413.153(c)(3).

(4) Loans from funded depreciation. (i) When the general fund of the provider borrows from the funded depreciation to obtain working capital for normal operating expenses to furnish patient care, interest incurred by the general fund is an allowable operating cost only if the interest expense is supported by documents that evidence that the funds were borrowed and that payment of interest and repayment of the funds are required, is separately identified in the provider's accounting records, and meets the necessary and proper tests described in §§ 413.153(b)(2) and (b)(3). However, if the general fund of the provider borrows from the funded depreciation account to acquire depreciable assets used in furnishing patient care, or for other capital purposes related to patient care, interest expense paid by the general fund to the

17

funded depreciation account is not an allowable cost. Providers are expected to use the funded depreciation for these purposes.

(ii) Loans from funded depreciation to the general fund are considered investments of funded depreciation, but do not have to meet the readily marketable test described in paragraph (e) of this section. Loans made from funded depreciation are subject to the requirement that funded depreciation must be available for the acquisition of depreciable assets used to furnish patient care, or for other capital purposes related to patient care. Costs incurred to secure lines of credit from lending institutions to ensure such availability are not allowable costs.

(iii) Funding of depreciation from general funds will not be recognized to the extent of any outstanding loans from the funded depreciation account to the general fund. Deposits from the general fund into the funded depreciation account must be first applied to reduce any loans outstanding from the funded depreciation to the general fund. When the loans are repaid in full, general funds deposited in the funded depreciation account are considered as repayments of the general fund. Therefore, any subsequent interest expense of the general fund paid to the funded depreciation fund is not an allowable cost.

(iv) A provider may loan its funded depreciation to a related organization for any purpose subject to the following conditions:

(A) Authorization for such a loan by the provider's appropriate managing body of the provider, such as Board of Trustees or Board of Directors, must be on file.

(B) The funded depreciation loaned must remain available, as specified in paragraph (e)(2) of this section, to the provider making the loan. Costs incurred for lines of credit to assure such availability are not allowable costs. During the period of time that the loan is outstanding, if the provider making the loan resorts to outside borrowing for a purpose for which its funded depreciation should have been used, interest expense on an amount of the outside borrowing up to the amount of the funded depreciation that should have been available would be disallowed as unnecessary.

(C) Such loans shall be considered investments of the provider's funded depreciation, but the requirement that funded depreciation be invested in readily marketable investments as required in paragraph (e) of this section is waived for such loans.

(D) The funded depreciation account must earn interest on such loans at a rate that does not exceed the rate that would be charged for a comparable loan from an independent lending institution. This investment income will not be used to reduce the provider's interest expense if all the other conditions in paragraph (e) of this

18

section are met. If the entity borrowing the funds is another provider participating in the Medicare program, the interest expense incurred on such loans would be allowable if the loan meets all of the interest expense requirements specified in § 413.153. (For purposes of § 413.153(b)(3)(ii), such loans are not considered to be with a related lender.)

(f) Gains and losses on disposal of assets -- (1) General. Depreciable assets may be disposed of through sale, scrapping, trade-in, exchange, demolition, abandonment, condemnation, fire, theft, or other casualty. If disposal of a depreciable asset results in a gain or loss, an adjustment is necessary in the provider's allowable cost. The amount of a gain included in the determination of allowable cost is limited to the amount of depreciation previously included in Medicare allowable costs. The amount of a loss to be included is limited to the undepreciated basis of the asset permitted under the program. The treatment of the gain or loss depends upon the manner of disposition of the asset, as specified in paragraphs (f) (2) through (6) of this section. The gain or loss on the disposition of depreciable assets has no retroactive effect on a proprietary provider's equity capital for years prior to the year of disposition.

(2) Bona fide sale or scrapping. (i) Except as specified in paragraph (f)(3) of this section, gains and losses realized from the bona fide sale or scrapping of depreciable assets are included in the determination of allowable cost only if the sale or scrapping occurs while the provider is participating in Medicare. The extent to which such gains and losses are included is calculated by prorating the basis for depreciation of the asset in accordance with the proportion of the asset's useful life for which the provider participated in Medicare. For purposes of this paragraph (f)(2)(i), scrapping refers to the physical removal from the provider's premises of tangible personal properties that are no longer useful for their intended purpose and are only salable for their scrap or junk value.

(ii) If the total amount of gains or losses realized from bona fide sales or scrapping does not exceed $ 5,000 within the cost reporting period or if the provider's cumulative utilization under the Medicare program is less than 5 percent, the net amount of gains or losses realized from sale or scrapping will be allowed as a depreciation adjustment in the period of disposal. For purposes of this paragraph (f)(2)(ii), the provider's cumulative Medicare utilization precentage is determined by comparing the cumulative total of the Medicare inpatient days for all reporting periods in which depreciation on the asset disposed of was claimed under the Medicare program to the cumulative total of inpatient days of the participating provider for the same reporting periods.

19

(iii) If the conditions specified in paragraph (f)(2)(ii) of this section are not met, the adjustment to reimbursable cost in the reporting period of asset disposition is calculated as follows:

(A) The total amount of gains or losses shall be allocated to all reporting periods under the Medicare program, based on the ratio of the depreciation allowed on the assets in each reporting period to the total depreciation allowed under the Medicare program.

(B) The results of this allocation are multiplied by the ratio of Medicare reimbursable cost to total allowable cost for each reporting period.

(C) The results of this multiplication are then added.

(D) Effective for cost reporting periods beginning on or after October 1, 1991, no adjustment will be made for the portion of gains or losses allocated to inpatient hospital services for which the hospital was paid under the fully prospective payment methodology as described in § 412.340 of this chapter or under the hold-harmless methodology based on the Federal rate as described in § 412.344(a)(1) of this chapter for new capital costs or in § 412.344(a)(2) of this chapter.

(iv) If a provider sells more than one asset for a lump sum sales price, the gain or loss on the sale of each depreciable asset must be determined by allocating the lump sum sales price among all the assets sold, in accordance with the fair market value of each asset as it was used by the provider at the time of sale. If the buyer and seller cannot agree on an allocation of the sales price, or if they do agree but there is insufficient documentation of the current fair market value of each asset, the intermediary for the selling provider will require an appraisal by an independent appraisal expert to establish the fair market value of each asset and will make an allocation of the sales price in accordance with the appraisal.

(3) Sale within 1 year after termination. Gains and losses realized from a bona fide sale of depreciable assets within 1 year immediately following the date on which the provider terminates participation in the Medicare program are also included in the determination of allowable cost, in accordance with the procedure specified in paragraph (f)(2) of this section. However, if several assets are sold for a lump sum sales price, the determination of fair market value must be based on the appraised value of the assets as they were last used by the provider while participating in the Medicare program.

(4) Exchange, trade-in or donation. Gains or losses realized from the exchange, trade-in, or donation of depreciable assets are not included in the determination of allowable cost. When the disposition of an asset is by means of exchange or trade-in, the historical cost of the new asset is the sum of the undepreciated cost of the asset

20

disposed of and the additional cash or other assets transferred (or to be transferred) to acquire the new asset. However, if the asset disposed of was acquired by the provider before its participation in the Medicare program and the sum of the undepreciated cost and the cash or other assets transferred (or to be transferred) exceed the list price or fair market value of the new asset, the historical cost of the new asset is limited to the lower of its list price or fair market value.

(5) Demolition or abandonment. (i) For purposes of this section, the term "abandonment" means the permanent retirement of an asset for any future purpose, not merely the provider's ceasing to use the asset for patient care purposes. To claim an abandonment under the Medicare program, the provider must have relinquished all rights, title, claim, and possession of the asset with the intention of never reclaiming it or resuming its ownership, possession, or enjoyment.

(ii) If losses resulting from the demolition or abandonment of depreciable assets do not exceed $ 5,000 within the cost-reporting period, the losses are to be allowed in the period of disposal.

(iii) If losses exceed $ 5,000 and, at the date of disposition, the demolished or abandoned assets are at least 80 percent depreciated as computed under the straight-line method, such losses are includable in the determination of allowable cost under the Medicare program in the period of disposal and the procedure provided in paragraph (f)(2)(iii) of this section must be used in determining the adjustment to reimbursable cost.

(iv) Losses in excess of $ 5,000 resulting from the demolition or abandonment of assets, which at the date of disposition are not 80 percent depreciated as computed under the straight-line method, must be capitalized as a deferred charge and amortized as follows:

(A) If the State Health Planning and Development Agency (SHPDA) designated under section 1521 of the Public Health Service Act approves the demolition or abandonment of a depreciable asset as being consistent with the health systems plan of the health service area in which the provider is located, the net loss realized shall be capitalized as a deferred charge and amortized over the remaining life of the demolished or abandoned asset, or at the rate of $ 5,000 per year, whichever is greater. If no SHPDA exists or if such agency is unable or unwilling to perform this function, the provider must submit a request for approval to the intermediary. The intermediary, after reviewing this request and before issuing the approval, will submit the request along with its recommendation to the appropriate Regional Office for its approval.

(B) If a provider fails to obtain approval as specified in paragraph (f)(5)(iv)(A) of this section, a loss is not allowable unless the demolished or abandoned asset is replaced. If the asset is replaced, the loss resulting from the unapproved demolition or abandonment must be capitalized as a deferred charge and amortized over the estimated useful life of the replacement asset or at the rate of $ 5,000 per year, whichever is greater.

(v) If a loss resulting from the demolition or abandonment is deferred and amortized and the provider terminates its participation in the Medicare program or ceases to use a replacement asset in the provision of patient care services, the unamortized deferred charge remaining at that time must not be included in determining allowable cost under the Medicare program.

(vi) Losses on demolition must include the demolition cost incurred by the provider for razing and removal of the asset, less any salvage value recovered by the provider. However, if a provider demolishes a depreciable asset for the purpose of preparing land for future sale, the net demolition cost incurred by the provider (razing and removal costs less salvage recovered) is considered a capital expenditure and added to the historical basis of the land.

(vii) If a provider purchases land on which there is a building, no depreciation will be allowed under the Medicare program unless the building is used in providing patient care. If the building is demolished, the entire purchase price and demolition cost shall be considered the historical cost of the land. If the building is used for patient care, but demolished within 5 years of purchase, the entire purchase price, less allowed depreciation, plus demolition cost will be considered the historical cost of the land.

(6) Involuntary conversion. (i) Losses resulting from the involuntary conversion of depreciable assets, such as condemnation, fire, theft, or other casualty, are generally included in the determination of allowable cost on a deferred basis if the asset is restored or replaced. However, losses resulting from a provider's imprudent management of its depreciable assets, such as the failure to obtain proper insurance coverage, are not included in the determination of allowable cost.

(ii) The net allowable loss from involuntary conversion must consist of the undepreciated cost of unrecovered book value of the asset, less amounts received from insurance proceeds gifts, and grants received from local, State, or Federal government, or any other source as a result of the involuntary conversion.

(iii) If the asset is replaced and the net allowable loss in any cost-reporting period does not exceed $ 5,000, the entire amount must be included in allowable cost in the period in which the loss is incurred. If the asset is replaced and the net allowable loss

22

in any cost-reporting period exceeds $ 5,000, the loss must be capitalized as a deferred charge and amortized over the useful life of the replacement or restored asset. If a replaced or restored asset ceases to be used in the provision of patient care services or the provider terminates its participation in the Medicare program, the unamortized deferred charge remaining at that time will not be included in determining allowable cost under the Medicare program.

(iv) If the provider fails to replace or restore an involuntarily converted asset, the loss is not included in determining allowable cost. However, if the provider intends to replace or restore the asset but is unable to do so because the designated SHPDA finds such replacement or restoration to be inconsistent with the health systems plan of the provider's health service area, the loss is allowable so long as the provider continues to participate in Medicare. In this case, the loss must be capitalized as a deferred charge and amortized over the remaining life of the involuntarily converted asset, or at the rate of $ 5,000 per year, whichever is greater.

(v) If a gain is realized from an involuntary conversion of depreciable assets, the net amount realized reduces the basis of the restored or replacement asset. If the asset is not restored or replaced, the gain is to be treated in accordance with paragraph (f)(2) of this section.

(7) Effect on equity capital. The unrecovered loss entered on the books of the provider as a deferred charge, in accordance with paragraphs (f) (5) and (6) of this section, is not includable in the computation of equity capital under § 413.157.

(8) Sale of replacement or restored assets. If a provider sells a replacement or restored asset while participating in the Medicare program or within 1 year immediately following the date on which it terminates its participation in the Medicare program, the unrecovered loss entered on the books of the provider as a deferred charge in accordance with paragraphs (f) (5) and (6) of this section will not be included in determining the gain or loss realized from the sale of the replacement or restored asset. However, if the sale of such asset is made to a related organization, as defined in § 413.17, and the purchasing organization continues as a provider in the Medicare program, the remaining deferred charge representing the unrecovered depreciable basis of the demolished, abandoned or destroyed asset must continue to be amortized over the remaining expected useful life of the replacement or restored asset. If the sale is made to an unrelated organization, further amortization of the deferred charge is not allowed.

(g) Establishment of cost basis on purchase of facility as an ongoing operation -- (1) Assets acquired after July 1, 1966 and before August 1, 1970. T1The cost basis

23

for the assets of a facility purchased as an ongoing operation after July 1, 1966, and before August 1, 1970, is the lowest of the --

(i) Total price paid for the facility by the purchaser, as allocated to the individual assets of the facility;

(ii) Total fair market value of the facility at the time of the sale, as allocated to the individual assets; or

(iii) Combined fair market value of the individually identified assets at the time of the sale.

(2) Assets acquired after July 31, 1970 and, for hospitals and SNFs, before July 18, 1984. For depreciable assets acquired after July 31, 1970 and, for hospitals and SNFs, before July 18, 1984, in addition to the limitations specified in paragraph (g)(1) of this section, the cost basis of the depreciable assets may not exceed the current reproduction cost depreciated on a straight-line basis over the life of the asset to the time of the sale.

(3) Assets acquired by hospitals and SNFs on or after July 18, 1984 and not subject to an enforceable agreement entered into before that date. Subject to paragraphs (b)(1)(ii) (B) through (G) and (b)(1)(iii) of this section, historical cost may not exceed the lowest of the following:

(i) The allowable acquisition cost of the asset to the owner of record as of July 18, 1984 (or, in the case of an asset not in existence as of July 18, 1984, the first owner of record of the asset);

(ii) The acquisition cost to the new owner; or

(iii) The fair market value of the asset on the date of acquisition.

(4) Transactions other than bona fide. If the purchaser cannot demonstrate that the sale was bona fide, in addition to the limitations specified in paragraph (g)(1), (2), and (3) of this section, the purchaser's cost basis may not exceed the seller's cost basis, less accumulated depreciation.

(h) Sale and leaseback agreements and other lease transactions. (1) For sale and leaseback agreements for all providers, and for sale and leaseback agreements for hospitals and SNFs entered into before October 23, 1992, a provider may include in its allowable costs incurred rental charges, as specified in a sale and leaseback agreement with a nonrelated purchaser involving plant facilities or equipment, only if --

(i) The rental charges are reasonable based on consideration of rental charges of comparable facilities and market conditions in the area; the type, expected life,

24

condition, and value of the facilities or equipment rented; and other provisions of the rental agreement;

(ii) Adequate alternate facilities or equipment that would serve the purpose are not or were not available at lower cost; and

(iii) The leasing was based on economic and technical considerations.

(2) If the conditions of paragraph (h)(1) of this section are not met, the amount a provider may include in its allowable costs as rental or lease expense under a sale and leaseback agreement may not exceed the amount that the provider would have included in its allowable costs had the provider retained legal title to the facilities or equipment such as interest expense on mortgages, taxes, depreciation, and insurance costs.

(3) For hospitals and SNFs entering into sale and leaseback agreements on or after October 23, 1992, the amount a provider may include in its allowable costs as rental or lease expense may not exceed the amount that the provider would have included in its allowable costs had the provider retained legal title to the facilities or equipment, such as interest expense on mortgages, taxes, depreciation, and insurance costs (the costs of ownership). This limitation applies both on an annual basis and over the useful life of the asset.

(i) If in the early years of the lease, the annual rental or lease costs are less than the annual costs of ownership, but in the later years of the lease the annual rental or lease costs are more than the annual costs of ownership, in the years that the annual rental or lease costs are more than the costs of ownership the provider may include in allowable costs annually the actual amount of rental or lease costs. The aggregate rental or lease costs included in allowable costs may not exceed the aggregate costs of ownership that would have been included in allowable costs over the useful life of the asset had the provider retained legal title to the asset.

(ii) If in the early years of the lease, the annual rental or lease costs exceed the annual costs of ownership, but in the later years of the lease the annual rental or lease costs are less than the annual costs of ownership, the provider may carry forward amounts of rental or lease costs that were not included in allowable costs in the early years of the lease due to the costs of ownership limitation, and include these amounts in allowable costs in the years of the lease when the annual rental or lease costs are less than the annual costs of ownership. In any given year the amount of actual annual rental or lease costs plus the amount carried forward to that year may not exceed the amount of the costs of ownership for that year.

(iii) In the aggregate, the amount of rental or lease costs included in allowable costs may not exceed the amount of the costs of ownership that the provider could have included in allowable costs had the provider retained legal title to the asset.

(4) For lease transactions of all providers entered into before October 23, 1992, a lease that meets the following conditions establishes a virtual purchase:

(i) The rental charge exceeds rental charges of comparable facilities or equipment in the area.

(ii) The term of the lease is less than the useful life of the facilities or equipment.

(iii) The provider has the option to renew the lease at a significantly reduced rental, or the provider has the right to purchase the facilities or equipment at a price that appears to be significantly less than what the fair market value of the facilities or equipment would be at the time acquisition by the provider is permitted.

(5)(i) If a lease is a virtual purchase under paragraph (h)(4) of this section, the rental charge is includable in allowable costs only to the extent that it does not exceed the amount that the provider would have included in allowable costs if it had legal title to the asset (the cost of ownership), such as straight-line depreciation, insurance, and interest. For purposes of computing the limitation on allowable rental cost in this paragraph, a provider may not include accelerated depreciation.

(ii) The difference between the amount of rent paid and the amount of rent allowed as rental expense is considered a deferred charge and must be capitalized as part of the historical cost of the asset when the asset is purchased.

(iii) If an asset is returned to the owner instead of being purchased, the deferred charge may be expensed in the year the asset is returned.

(iv) If the term of the lease is extended for an additional period of time at a reduced lease cost and the option to purchase still exists, the deferred charge may be expensed to the extent of increasing the reduced rental to an amount not in excess of the cost of ownership.

(v) If the term of the lease is extended for an additional period of time at a reduced lease cost and the option to purchase no longer exists, the deferred charge may be expensed to the extent of increasing the reduced rental to a fair rental value.

(6) For lease transactions entered into on or after October 23, 1992, a lease that meets any one of the following conditions establishes a virtual purchase:

(i) The lease transfers title of the facilities or equipment to the lessee during the lease term.

(ii) The lease contains a bargain purchase option.

26

(iii) The lease term is 75 percent or more of the useful life of the facilities or equipment. This provision is not applicable if the lease begins in the last 25 percent of the useful life of the facilities or equipment.

(iv) The present value of the minimum lease payments (that is, payments to be made during the lease term, including bargain purchase option, guaranteed residual value, or penalties for failure to renew) equals 90 percent or more of the fair market value of the leased property. This provision is not applicable if the lease begins in the last 25 percent of the useful life of the facilities or equipment. The present value is computed using the lessee's incremental borrowing rate, unless the interest rate implicit in the lease is known and is less than the lessee's incremental borrowing rate, in which case, the interest rate implicit in the lease is used.

(7)(i) If a lease is a virtual purchase under paragraph (h)(6) of this section, the rental charge is includable in allowable costs only to the extent that it does not exceed the amount that the provider would have included in allowable costs if it had legal title to the asset (the costs of ownership), such as straight-line depreciation, insurance, and interest. For purposes of computing the limitation on allowable rental cost as described in this paragraph, a provider may not include accelerated depreciation in its allowable costs.

(ii) The difference between the amount of rent paid and the amount of rent allowed as rental expense is considered a deferred charge and is capitalized as part of the historical cost of the asset when the asset is purchased.

(iii) If an asset is returned to the owner instead of being purchased, the deferred charge may be expensed in the year the asset is returned.

(iv) If the term of the lease is extended for an additional period of time at a reduced lease cost and the option to purchase still exists, the deferred charge may be expensed to the extent of increasing the reduced rental to an amount not in excess of the cost of ownership.

(v) If the term of the lease is extended for an additional period of time at a reduced lease cost and the option to purchase no longer exists, the deferred charge may be expensed to the extent of increasing the reduced rental to a fair rental value.

(vi) If the lessee becomes the owner of the leased asset (either by operation of the lease or by other means), the amount considered as depreciation, for the purpose of having computed the limitation expressed in paragraph (h)(7)(i) of this section, must be used in calculating the limitation on adjustments to depreciation for the purpose of determining any gain or loss upon disposal of an asset under paragraph (f) of this section.

(i) Intergovernmental transfer of facilities. The basis for depreciation of assets transferred under appropriate legal authority from one governmental entity to another is as follows:

(1) The historical cost incurred by the present owner in acquiring the asset under a bona fide sale. The historical cost may not exceed the lower of current reproduction cost adjusted for straight-line depreciation over the life of the asset to the time of the purchase of fair market value at the time of the purchase.

(2) The fair market value at the time of donation under a bona fide donation of the asset (subject to the limitations set forth under paragraph (i) of this section). An asset is considered donated when a governmental entity acquires the asset without assuming the functions for which the transferor used the asset or making any payment for it in the form of cash, property, or services.

(3) If neither paragraph (h) (1) nor (2) of this section applies, for example, the transfer was solely to facilitate administration or to reallocate jurisdictional responsibility, or the transfer constituted a taking over in whole or in part of the function of one governmental entity by another governmental entity, the basis for depreciation is --

(i) With respect to an asset on which the transferor has claimed depreciation under the Medicare program, the transferor's basis under the Medicare program prior to the transfer. The method of depreciation used by the transferee may be the same as that used by the transferor, or the transferee may change the method, as permitted under paragraph (d)(2) of this section; or

(ii) With respect to an asset on which the transferor has not claimed depreciation under the Medicare program, the cost incurred by the transferor in acquiring the asset (not to exceed the basis that would have been recognized had the transferor participated in the Medicare program) less depreciation calculated on the straight-line basis over the life of the asset to the time of transfer.

(j) Basis of assets donated to a provider -- (1) Assets not used or depreciated under the Medicare program. If an asset has never been used or depreciated under the Medicare program and is donated to a provider, the basis for the purpose of calculating depreciation and equity capital (if applicable) is the fair market value of the asset at the time of donation.

(2) Assets used or depreciated under the Medicare program. If an asset has been used or depreciated under the Medicare program and is donated to a provider, the basis for the purpose of calculating depreciation and equity capital (if applicable) is the lesser of --

28

(i) The fair market value at the time of donation; or

(ii) The net book value in the hands of the owner last participating in the Medicare program.

(3) Transfers of State hospitals to nonprofit corporations without monetary consideration. If a State transfers a hospital to a nonprofit corporation without monetary consideration on or after July 18, 1984, the depreciable basis of the assets to the new owner is the net book value of the assets as recorded on the State's books at the time of the transfer. For purposes of this section, monetary consideration includes cash, new debt, and assumed debt.

(k) Limitation on Federal participation for capital expenditures. The allowance for depreciation is not an allowable cost for certain capital expenditures as described in § 413.161.

(l) Transactions involving a provider's capital stock -- (1) Acquisition of capital stock of a provider. If the capital stock of a provider is acquired, the provider's assets may not be revalued. For example, if Corporation A purchases the capital stock of Corporation B, the provider, Corporation B continues to be the provider after the purchase and Corporation A is merely the stockholder. Corporation B's assets may not be revalued.

(2) Statutory merger. A statutory merger is a combination of two or more corporations under the corporation laws of the State, with one of the corporations surviving. The surviving corporation acquires the assets and liabilities of the merged corporation(s) by operation of State law. The effect of a statutory merger upon Medicare reimbursement is as follows:

(i) Statutory merger between unrelated parties. If the statutory merger is between two or more corporations that are unrelated (as specified in § 413.17), the assets of the merged corporation(s) acquired by the surviving corporation may be revalued in accordance with paragraph (g) of this section. If the merged corporation was a provider before the merger, then it is subject to the provisions of paragraphs (d)(3) and (f) of this section concerning recovery of accelerated depreciation and the realization of gains and losses. The basis of the assets owned by the surviving corporation are unaffected by the transaction. An example of this type of transaction is one in which Corporation A, a nonprovider, and Corporation B, the provider, are combined by a statutory merger, with Corporation A being the surviving corporation. In such a case the assets of Corporation B acquired by Corporation A may be revalued in accordance with paragraph (g) of this section.

(ii) Statutory merger between related parties. If the statutory merger is between two or more related corporations (as specified in § 413.17), no revaluation of assets is

29

permitted for those assets acquired by the surviving corporation. An example of this type of transaction is one in which Corporation A purchase the capital stock of Corporation B, the provider. Immediately after the acquisition of the capital stock of Corporation B, there is a statutory merger of Corporation B and Corporation A, with Corporation A being the surviving corporation. Under these circumstances, at the time of the merger the transaction is one between related parties and is not a basis for revaluation of the provider's assets.

(3) Consolidation. A consolidation is the combination of two or more corporations resulting in the creation of a new corporate entity. If at least one of the original corporations is a provider, the effect of a consolidation upon Medicare reimbursement for the provider is as follows:

(i) Consolidation between unrelated parties. If the consolidation is between two or more corporations that are unrelated (as specified in § 413.17), the assets of the provider corporation(s) may be revalued in accordance with paragraph (g) of this section.

(ii) Consolidation between related parties. If the consolidation is between two or more related corporations (as specified in § 413.17), no revaluation of provider assets is permitted.

**HISTORY:** [51 FR 34793, Sept. 30, 1986, as amended at 56 FR 43456, Aug. 30, 1991; 57 FR 3017, Jan. 27, 1992; 57 FR 39830, Sept. 1, 1992; 57 FR 43919, Sept. 23, 1992; 58 FR 17528, Apr. 5, 1993; 59 FR 45401, Sept. 1, 1994]

**AUTHORITY:** AUTHORITY NOTE APPLICABLE TO ENTIRE PART: Secs. 1102, 1861(v)(1)(A), and 1871 of the Social Security Act (42 U.S.C. 1302, 1395x(v)(1)(A), and 1395hh).

**NOTES:** NOTES APPLICABLE TO ENTIRE CHAPTER: EDITORIAL NOTE: Nomenclature changes affecting chapter IV appear at 45 FR 53806, Aug. 13, 1980; 50 FR 12741, Mar. 29, 1985; 50 FR 33034, Aug. 16, 1985; 51 FR 41338, Nov. 14, 1986; 53 FR 6634, Mar. 2, 1988; 53 FR 47201, Nov. 22, 1988; 56 FR 8852, Mar. 1, 1991.



8 of 11 DOCUMENTS

Copyright 2013 CCH Incorporated, All Rights Reserved
CCH Medicare & Medicaid Guide: Program Memoranda and
Other CMS Transmittals

Program Memoranda (1971 - 2003)
Program Memorandum

Medicare & Medicaid Guide (CCH) P 151,459

Oct. 19, 2000

P 151,459 Nonprofit Provider Mergers and Consolidations

 P 151,459.  Program Memorandum, HCFA Pub. 60A Transmittal No. A-00-76 Oct. 19, 2000

**Medicare: Provider Reimbursement**

 **Provider reimbursement** -- **Allowable costs** -- **Mergers and consolitations**. --

For Medicare to recognize a gain or loss on a merger or consolidation involving a nonprofit provider, the merger or consolidation may not be between related parties. Because ownership of nonprofits is more difficult to determine than with for-profit corporations, HCFA will look at the make-up of boards and management groups to determine nonprofit relatedness. HCFA will also examine if the sales price is related to the fair market value of the assets sold.

See  P 4682.

TEXT:

**[Text of Memorandum]**

**CHANGE REQUEST 1290**

**SUBJECT: Clarification of the Application of the Regulations at 42 CFR 413.134(l) to Mergers and Consolidations Involving Non-profit Providers**

*BACKGROUND*

This Program Memorandum (PM) is being issued to clarify application of the regulations at 42 CFR 413.134(l) (originally, 42 CFR 405.415(l)) to mergers and consolidations involving non-profit providers. The purpose of that regulation section, originally published February 5, 1979 (44 *FR* 6912), was to clarify existing Medicare program policy concerning certain effects of capital stock transactions involving for-profit providers. In summary, that regulation section provides that the acquisition of the capital stock of a provider, in and of itself, is not a change of ownership for Medicare payment purposes, and therefore, would not give rise to a revaluation of the acquired assets, nor an adjustment to recognize a gain or loss on the disposal of assets. The regulation further provides that mergers or consolidations between or among for-profit providers would give rise to a revaluation of the merged or consolidated assets only if the parties to the merger or consolidation are not related organizations as defined in the regulations at 42 CFR 413.17.

With regard to recognizing a gain or loss adjustment on the merged or consolidated assets, the regulation provides that such gain or loss may be recognized, but only as provided for in the regulations at 42 CFR 413.134(f). That latter regulation section provides for the recognition of a gain or loss only where the asset disposal results from a *bona fide* sale or scrapping (occurring before December 1, 1997), a demolition or abandonment, or an involuntary conversion. A *bona fide* sale is defined in the Provider Reimbursement Manual (PRM), Part 1, (HCFA Pub. 15-1) at 104.24.

32

Therefore, the merger or consolidation must involve one of those events in order to trigger the recognition of a gain or loss on the merged or consolidated assets.

     **NOTE**:Section 4404 of the Balanced Budget Act of 1997 effectively eliminated Medicare recognition of gains or losses resulting from the sale or scrapping of an asset that occurs on or after December 1, 1997. Thus, adjustments to recognize gains and losses on sales or scrappings of assets that occur on or after that date will not be recognized for Medicare payment purposes. Regulations implementing this change were published in the *Federal Register* on January 9, 1998 (63 *FR* 1379).

Because there is no similar regulation specifically addressing mergers and consolidations between or among non-profit entities, we are clarifying the applicability of the above cited regulation sections to such mergers or consolidations.

 *APPLICATION*

The above cited regulation sections are applicable to mergers and consolidations involving non-profit providers. However, as with transactions involving for-profit entities, in order for Medicare to recognize a gain or loss on the disposal of assets, the merger or consolidation must occur between or among parties that are not related as described in the regulations at 42 CFR 413.17 and the transaction must involve one of the events described in 42 CFR 413.134(f) as triggering a gain or loss recognition by Medicare (typically, a *bona fide* sale, as defined in the PRM at § 104.24, because a merger or consolidation could, but usually does not, involve a scrapping, demolition, abandonment, or involuntary conversion).

 *SPECIAL CONSIDERATIONS APPLICABLE TO TRANSACTIONS INVOLVING NON-PROFIT ORGANIZATIONS*

Non-profit organizations differ in significant ways from for-profit organizations. Non-profit organizations typically do not have equity interests (i.e., shareholders, partners), exist for reasons other than to provide goods and services for a profit, and may obtain significant resources from donors who do not expect to receive monetary repayment of, or a return on, the resources they provide. These differences, among others, cause non-profit organizations to associate or affiliate through mergers or consolidations for reasons that may differ from the traditional for-profit merger or consolidation. Because the regulations at 42 CFR 413.134(l) were written to address only for-profit mergers and consolidations, certain special considerations must be regarded in applying that regulation section to non-profit mergers and consolidations.

*Related Organizations*:

Unlike for-profit mergers or consolidations, which often involve a dispatching of the former governing body and/or management team, many non-profit mergers and consolidations involve the continuation, in whole or in part, of the former governing board and/or management team. In applying the related organizations principle at 42 CFR 413.17, consideration must be given to whether the composition of the new board of directors, or other governing body or management team, includes significant representation from the previous board(s) or management team(s). If that is the case, no real change of control of the assets has occurred and no gain or loss may be recognized as a result of the transaction. The fact that the parties are unrelated before the transaction does not bar a related organizations finding as a result of the transaction. That is, it is appropriate to compare the governing board/management team composition before the transaction with the governing board/management team composition after the transaction, even though there was no contemporaneous co-existence of those boards/teams. (See HCFA Ruling HCFAR 80-4 and the PRM at 1011.4.) Moreover, whether the constituent corporations in a merger or consolidation are or are not related is irrelevant; rather, the focus of the inquiry should be whether significant ownership or control exists between a corporation that transfers assets and the corporation that receives them. The term "significant" as used in this PM has the same meaning as the terms "significant" or "significantly" in the regulations at 42 CFR 413.17 and the PRM at Chapter 10. Important considerations in this regard

34

include that 1) the determination of common control is subjective (i.e., there is no objective measure or "rule of thumb" in establishing common control), 2) each situation stands on its own merits based on the facts and circumstances unique to that situation, 3) a finding of common control does not require 50 percent or more representation, and 4) there is no need to look "behind the numbers" to see if control is actually being exercised, rather the mere potential to control is sufficient.

**EXAMPLE 1**: Corporation A and Corporation B, both non-profit providers, are combined by statutory merger with Corporation A surviving. Corporations A and B were unrelated prior to the transaction, each being controlled by its respective Board of Directors of ten members each. After the merger, Corporation A's new ten member Board of Directors includes five individuals that served on Corporation A's pre-merger board, and five individuals that served on Corporation B's pre-merger board. Thus, Corporation A's new Board of Directors includes a significant number of individuals from both of the former entities' boards. Because no significant change of control of the assets of former Corporation B has occurred, the transaction as between Corporation A and Corporation B is deemed to be between related parties and no gain or loss will be recognized as a result of the transaction.

**EXAMPLE 2**: Corporation A and B consolidate to form Corporation C. Corporations A and B were unrelated prior to the transaction, each being controlled by its respective Board of Directors of eight members each. After the consolidation, Corporation C's Board of Directors consists of seven individuals, all of whom were members of Corporation A's board. Because no significant change of control of the assets of Corporation A occurred, the transaction as between A and C is deemed to be one of related parties and no gain or loss on will be recognized as a result of the transaction. However, because there has been a significant change of control of the assets of Corporation B, the transaction as between B and C is *not* one of related parties. Therefore, with respect to the assets transferred from B to C, a gain or loss may be recognized (if the other criteria for recognizing gain or loss, including the requirement of a *bona fide* sale are met).

*Bona Fide Sale*:

Unlike for-profit mergers or consolidations, which are typically driven by the ownership equity interests to seek fair market value for the assets involved in the transaction, many non-profit mergers and consolidations have only the interests of the community-at-large to drive the transaction. This community interest does not always involve engaging in a *bona fide* sale or seeking fair market value for the assets given. Rather, the assets and liabilities are simply combined on the merged or consolidated entity's books. The merged/consolidated entity may or may not record a gain or loss resulting from such a transaction for financial reporting purposes. Notwithstanding the treatment of the transaction for financial accounting purposes, no gain or loss may be recognized for Medicare payment purposes unless the transfer of the assets resulted from a *bona fide* sale as required by regulation 413.134(f) and as defined in the PRM at 104.24. The regulations at 42 CFR 413.134(l) do not permit recognition of a gain or loss resulting from the mere combining of multiple entities' assets and liabilities without regard to whether a *bona fide* sale occurred.

A *bona fide* sale typically occurs under the following general circumstances. From the perspective of the seller, a preliminary decision is made to consider selling the business. Word is spread that the property may be available for purchase. The seller's main objective is to maximize the consideration received and the seller would not be expected to be interested in who the buyer is except for the buyer's ability to pay. If the seller receives an offer to its liking, it will agree to a sale. From the buyer's perspective, the environment is the same except the buyer is seeking to minimize the price paid. If a deal is reached, the marketplace negotiations between the seller and the buyer have defined the arms-length component of a *bona fide* sale. In other words, for Medicare payment purposes, a recognizable gain or loss resulting from a sale of depreciable assets arises after an arm's-length business transaction between a willing and well-informed buyer and seller. An arm's-length transaction is a transaction negotiated by unrelated parties, each acting in its own self interest in which objective value is defined after selfish bargaining. However, frequently this is not the environment that brings non-profit entities together through merger or consolidation.

36

As with for-profit entities, in evaluating whether a *bona fide* sale has occurred in the context of a merger or consolidation between or among non-profit entities, a comparison of the sales price with the fair market value of the assets acquired is a required aspect of such analysis. As set forth in PRM 104.24, reasonable consideration is a required element of a *bona fide* sale. Thus, a large disparity between the sales price (consideration) and the fair market value of the assets sold indicates the lack of a *bona fide* sale. With regard to non-profit mergers or consolidations, often the sales price consists of assumed debt only, but may also include cash and/or new debt. Non-monetary consideration, such as a seller's concession from a buyer that the buyer must continue to provide care for a period of time or to provide care to the indigent, may not be taken into account in evaluating the reasonableness of the overall consideration (even where such elements may be quantified in dollar terms). These factors are more akin to goodwill than to consideration.

Appraisals may be relied on to establish the fair market value of depreciable assets. (See PRM § 134ff.) However, caution must be taken in evaluating the appropriateness of the valuations established by appraisal for the purpose of this comparison.

The three most common valuation methodologies are the "cost approach," the "market approach," and the "income approach." A single appraisal may use one or more of these methodologies to arrive at a valuation of the entity. The cost approach is the only methodology that produces a discrete indication of the value for the individual assets of the business, and thus, is the approach that is used to allocate a lump sum sales price among the assets sold. (See 42 CFR 413.134(f)(2)(iv).) The market approach produces an estimate of value by comparing the entity being valued to sales of similar businesses. The income approach produces a valuation through analysis of the predicted future stream of income. Both the market approach and the income approach produce a valuation of the business enterprise as a whole, without regard to the individual fair market values of the constituent assets. As a result, both the market approach and the income approach could produce an entity valuation that is less than the market value of the current assets. Moreover, the income approach has minimal application in the non-profit sector because 1) earnings are often understated

37

due to charity care, pricing limitations, and government regulations, and 2) the approach uses complex formulae that include some factors that are of questionable use in valuing non-profit entities (e.g., common stock risk premium). For the foregoing reasons, the cost approach is the most appropriate methodology to be used in establishing the fair market value of the assets sold for the purpose of comparison with the sales price in a *bona fide* sale analysis.

Moreover, in analyzing whether a *bona fide* sale has occurred, a review of the allocation of the sales price among the assets sold is appropriate. In some situations, the "sales price" of the assets may be barely in excess of, or less than, the market value of the current assets sold, leaving a minimal, or no, part of the sales price to be allocated to the fixed (including the depreciable) assets. In such a circumstance, effectively the current assets have been sold, and the fixed assets have been given over at minimal or no cost. If a minimal or no portion of the sales price is allocated to the fixed (including the depreciable) assets a *bona fide* sale of those assets has not occurred. In this regard, because consideration was exchanged for the business as a whole, this type of transaction should not be considered a donation of the fixed assets (see the PRM at § 104.16). Rather, this should be viewed as a non-*bona fide* sale of the fixed assets.

**EXAMPLE 3**: Corporation A and B merge, with Corporation A being the surviving corporation. The assets transferred from Corporation B consisted of cash, cash equivalents, and other current assets totaling $ 23 million and fixed assets (plant, property, and equipment) valued at $ 24 million by an independent appraisal. Corporation B's liabilities that were assumed by Corporation A totaled $ 22 million. No other consideration was exchanged as part of the transaction. Because the sales price (assumed liabilities) is allocated first to the cash, cash equivalents, and other current assets, no part of the sales price was allocated to the fixed assets. Because no part of the purchase price was allocated to the fixed assets, a *bona fide* sale of those assets has not occurred and Medicare would not recognize a loss as a result of the transaction.

38

Absent evidence of a *bona fide* sale of the assets, a reasonable conclusion may be drawn that the gain or loss resulted from the mere combining of the assets and liabilities of the merged/consolidated entities. Because neither the regulations nor the program instructions provide for Medicare recognition of such gains or losses, the gains or losses must be denied.

 The effective date for this PM is not applicable. This PM does not include any new policies regarding mergers or consolidations involving non-profit entities. Intermediaries are to apply this clarification to all cost reports for which a final notice of program reimbursement has not been issued and to all settled cost reports that are subject to reopening in accordance with the Provider Reimbursement Manual, Part 1, (HCFA Pub. 15-1), Chapter 29.

 The implementation date for this PM is October 19, 2000.

 These instructions should be implemented within your current operating budget.

 This PM may be discarded after July 30, 2001.

UPDATE-DATE: June 10, 2013

## CERTIFICATE OF SERVICE

Pursuant to Rule 25 of the Federal Rules of Appellate Procedure, I hereby certify that I have served on July 29, 2013 a copy of the foregoing document electronically through the Court's CM/ECF system on all registered counsel, as reflected by the electronic date stamp generated by such system.

/s/ Jeffrey A. Lovitky

_____

JEFFREY A. LOVITKY